*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0255P (6th Cir.)
File Name: 02a0255p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee/*
*Cross-Appellant (00-6020),*

                    *v.*

ANTONIO BURNS (00-5848),
ANTHONY HARDEN
(00-5846), JEROME HARDEN,
JR. (00-5851), and MICHAEL
JORDON (00-5839),
            *Defendants-Appellants/*
                *Cross-Appellees.*

Nos. 00-5839/
5846/5848/5851/
6020

>
Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 99-00003—William O. Bertelsman, District Judge.

Argued and Submitted: June 19, 2002

Decided and Filed: July 29, 2002

Before: COLE and GILMAN, Circuit Judges; MILLS,
District Judge.*

_____

*The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

1

———————————

## COUNSEL

**ARGUED:**  Michael L. Boylan, Louisville, Kentucky, for Appellant in Case No. 00-5848.   Laura K. Voorhees, ASSISTANT UNITED STATES ATTORNEY, Covington, Kentucky, for Appellee in Case No. 00-5848.  **ON BRIEF:** Michael L. Boylan, Louisville, Kentucky, Patrick F. Nash, Lexington, Kentucky, Melynda W. Cook-Reich, SCHAD & COOK, Indian Springs, Ohio, Ed W. Tranter, TRANTER & MEIER, Fort Thomas, Kentucky, for Appellants.  Laura K. Voorhees, ASSISTANT UNITED STATES ATTORNEY, Covington, Kentucky, Charles P. Wisdom, Jr., ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellees.

———————————

## OPINION

———————————

RONALD LEE GILMAN, Circuit Judge.  In March of 2000, a federal-court jury found Antonio Burns, Anthony Harden, Jerome Harden, Jr., and Michael Jordon guilty of crimes related to a conspiracy to possess and distribute cocaine base (crack cocaine).  The defendants now appeal their convictions and sentences.  All four defendants argue that the evidence at trial was insufficient to support the jury's verdict, that the district court abused its discretion in permitting the government to use a computer-generated "Power Point" presentation during its opening statement, and that they were sentenced in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  Burns and J. Harden claim that the district court erred in denying their motions to suppress evidence gathered during searches of Burns's car and motel room.  A. Harden, J. Harden, and Jordon argue that the district court erred in its determination of the amount of drugs for which they were held responsible.  Jordon also claims that the district court failed to consider his motion for a downward

reductions.   As a result, we reverse the minimal-role reductions and remand the case for the purpose of resentencing A. Harden, J. Harden, and Jordon without such a reduction.  This is not to say, however, that a two or three level reduction for a minor role under Sentencing Guidelines § 3B1.2 would necessarily be inappropriate on remand. Whether the conduct of these defendants fits within the "minor role" criteria of the Sentencing Guidelines is not presently before us.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court with respect to the convictions of all four defendants and the sentence of Burns, **REVERSE** the minimal-role reductions for A. Harden, J. Harden, and Jordon, and **REMAND** the case for the purpose of resentencing these three defendants in a manner consistent with this opinion.

understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant." *Id.* "The culpability determination is heavily dependent upon the facts, and the defendant has the burden of providing mitigating factors by a preponderance of the evidence." *United States v. Perry*, 908 F.2d 56, 58 (6th Cir. 1990) (internal quotation marks and citations omitted). We will reverse a district court's finding regarding a defendant's role in an offense only if we determine that the finding is clearly erroneous. *Id.*

In concluding that A. Harden, J. Harden, and Jordon were minimal participants, the district court focused on the fact that several of the coconspirators who testified at trial appeared to have greater roles in the conspiracy. Burns, Keene, Porter, Trujillo, and Walker, for example, each bought and sold multiple kilogram amounts of crack cocaine, something that the three defendants receiving the minimal-role reduction did not do on their own. But the district court's conclusion that A. Harden, J. Harden, and Jordon had minimal roles discounts the significant body of evidence that all three were aware of the full scope of Burns's enterprise and regularly assisted Burns in processing and selling crack cocaine on a daily basis.

The Application Notes to § 3B1.2 provide two examples of the type of conspirator for whom a four-level minimal role reduction would be appropriate: "someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs." U.S. Sentencing Guidelines Manual § 3B1.2 cmt. n. 2. In contrast to these examples of minimal roles, A. Harden, J. Harden, and Jordon each carried, delivered, packaged, and sold crack cocaine in partnership with Burns for over a year. The activities of these three defendants are so much greater in scope and duration than the one-time functionary duties posited in the Application Notes that the district court committed clear error when it granted the four-level

departure based upon his qualification for a mitigating-role adjustment. In addition, the government cross-appeals the district court's decision to grant A. Harden, J. Harden, and Jordon four-level sentence reductions for having played a minimal role in the drug conspiracy. For the reasons set forth below, we **AFFIRM** the judgment of the district court with respect to the convictions of all four defendants and the sentence of Burns, **REVERSE** the minimal-role reductions for A. Harden, J. Harden, and Jordon, and **REMAND** the case for the purpose of resentencing these three defendants.

## I. BACKGROUND

### A.  Convictions and sentences

Burns, the central figure in the alleged conspiracy, was convicted on Count 1 (engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848), Count 2 (participating in a conspiracy to distribute 20 kilograms of cocaine base in violation of 21 U.S.C. § 846), Counts 5, 6, and 7 (using a communications facility in the commission of a federal crime in violation of 21 U.S.C. § 843(b)), Count 8 (attempting to possess with the intent to distribute 30 ounces of cocaine base in violation of 21 U.S.C. § 846), and Count 9 (corruptly attempting to persuade and influence a witness in an official proceeding in violation of 18 U.S.C. § 1512(b)(1)). A. Harden, J. Harden, and Jordon were each found guilty on Count 2, and A. Harden and Jordon were also convicted on Count 3 (possessing with the intent to distribute one-half ounce of cocaine base in violation of 21 U.S.C. § 841(a)(1)) and Count 4 (traveling in interstate commerce to commit an unlawful activity, or aiding and abetting the same, in violation of 18 U.S.C. § 1952(a)(3)).

In June of 2000, Burns was sentenced to concurrent terms of life in prison on Counts 1 and 8, as well as to 48 concurrent months on Counts 5, 6, and 7, and 120 concurrent months on Count 9. Count 2 was dismissed against Burns after the jury verdict because it was considered as a lesser-included offense

within the continuing criminal enterprise count. A. Harden received a sentence of 188 concurrent months in prison on Counts 2 and 3, and 60 concurrent months on Count 4. J. Harden received a sentence of 168 months in prison on Count 2. Jordon was sentenced to 151 concurrent months in prison on Counts 2 and 3, and 60 concurrent months on Count 4. A. Harden, J. Harden, and Jordon also received five years of supervised release. In calculating their offense levels, the district court granted A. Harden, J. Harden, and Jordon four-level reductions for having played a minimal role in the conspiracy pursuant to United States Sentencing Guidelines § 3B1.2(a). These appeals followed.

## B.   Facts relating to Counts 1 and 2

Most of the evidence against Burns and his codefendants came from the testimony of witnesses who, after their arrests on drug charges, cooperated with the government in its investigation into Burns's suspected drug-trafficking activities. Each of these witnesses, including Mary Baker, Carol Baldwin, Paul Green, Lee Keene, Chris Porter, Larry Trujillo, and Jamie Walker, testified at trial that Burns supplied crack cocaine to themselves or others, and that A. Harden, J. Harden, or Jordon drove or otherwise assisted Burns. Between November of 1997 and January of 1999, Burns distributed multiple kilograms of crack cocaine per week with the help of his codefendants, as well as Paul Green, Lee Keene, Eugene West, Tio West, and Burns's then-girlfriend "Tia." Burns, A. Harden, and Jordon were adults at all times during this period, but J. Harden did not turn 18 years old until March 25, 1998.

During the summer of 1998, A. Harden, J. Harden, Jordon, and, on occasion, Eugene West weighed and packaged crack cocaine at Baker's Covington, Kentucky apartment. The usual practice was for A. Harden, J. Harden, and Jordon to process the crack cocaine while Burns watched. At times, A. Harden processed it alone. After the drugs were packaged, Burns sent J. Harden or Jordon to bring buyers to Baker's

cocaine. With such an extensive involvement in Burns's drug operation, it was reasonably foreseeable to these defendants both that the conspiracy involved over 1.5 kilograms of crack cocaine and that their actions were furthering that jointly undertaken criminal activity. The district court therefore did not clearly err in determining that these defendants were responsible for at least 1.5 kilograms of crack cocaine.

### 3.   *Denial of Jordon's motion for a downward departure*

A district court's decision not to grant a downward departure is generally not reviewable. *United States v. Pickett*, 941 F.2d 411, 417-18 (6th Cir. 1991). Contrary to Jordon's contention, the district court considered and rejected Jordon's motion for a downward departure pursuant to United States Sentencing Guidelines § 2D1.1. Jordon's counsel raised the issue in the sentencing colloquy by asking the district court to consider facts that allegedly showed Jordon's lesser culpability. Rather than grant the downward departure, the court replied that it had already taken those facts into account when it gave Jordon a four-level reduction for "minimal participation" in the conspiracy. Because this ruling is not reviewable in light of the district court's consideration of the request on the merits, Jordon's appeal of this issue is to no avail.

## D.   The government's cross-appeal of the four-level minimal-role reduction for A. Harden, J. Harden, and Jordon

The government contends in its cross-appeal that the district court erred in granting A. Harden, J. Harden, and Jordon a sentencing reduction based upon their allegedly "minimal role" in the drug-trafficking conspiracy. A minimal-role reduction "is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group." U.S. Sentencing Guidelines Manual § 3B1.2 cmt. n.4. In determining a defendant's level of culpability, "the defendant's lack of knowledge or

received on Count 1, any *Apprendi* error by the district court in determining the amount of drugs for which Burns was responsible with regard to Count 8 is also harmless. *Id.*

### 2. Amount of drugs for which A. Harden, J. Harden, and Jordon were responsible on Count 2

A. Harden, J. Harden, and Jordon each challenge the district court's finding that their role in the conspiracy involved responsibility for at least 1.5 kilograms of crack cocaine. We will reverse a sentencing court's drug-quantity determination only if we conclude that the determination is clearly erroneous. *United States v. Owusu*, 199 F.3d 329, 338 (6th Cir. 2000). "A finding is clearly erroneous when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Heights Community Congress v. Hilltop Realty, Inc.*, 774 F.2d 135, 140 (6th Cir. 1985). "[T]he test is whether there is evidence in the record to support the lower court's finding, and whether its construction of that evidence is a reasonable one." *Id.*

"A coconspirator is not necessarily responsible for the total amount of cocaine involved in the conspiracy for the purposes of establishing his base offense level. Rather, a participant is responsible for other conspirators' conduct only if that conduct was reasonably foreseeable to him and in furtherance of the execution of the jointly undertaken criminal activity." *United States v. Jenkins*, 4 F.3d 1338, 1346 (6th Cir. 1993); U.S. Sentencing Guidelines Manual § 1B1.3, cmt. n. 2. As set forth above in Part I.B., there was ample evidence at trial that A. Harden, J. Harden, and Jordon were involved on a daily basis in a conspiracy involving over two dozen kilograms of crack cocaine. They drove Burns to his drug deals, assisted in processing and selling the crack cocaine, and carried money back and forth between Burns and his customers. Keene testified that, over a five-month period, each of these defendants assisted with more than one transaction involving the weekly sale of a kilogram of crack

apartment to make purchases. A. Harden, J. Harden, and Jordon, as well as Eugene and Tio West, sold crack cocaine under Burns's direction. Baker also purchased crack cocaine from Burns through J. Harden, and carried crack cocaine for Burns, J. Harden, Jordon, and Eugene West until her arrest on drug charges in September of 1998. During a visit to Burns in Cincinnati in December of 1998, Baker observed Burns, A. Harden, J. Harden, Eugene West, and Tio West buy and process crack cocaine, as well as discuss crack cocaine sales.

Baldwin met Burns in January of 1998, when Burns delivered crack cocaine to the apartment of Porter, Baldwin's boyfriend. She was present on several subsequent occasions when Burns, accompanied by J. Harden, delivered crack cocaine to Porter. J. Harden sometimes delivered the crack cocaine alone, as did Burns's girlfriend "Tia." After Baldwin was arrested in March of 1998 for distributing crack cocaine that her boyfriend Porter had purchased from Burns, Burns posted Baldwin's bond.

Porter was also arrested in March of 1998 for the possession of crack cocaine. He began buying crack cocaine from Burns in December of 1997, and did so approximately every other day until his arrest. Porter, like Baldwin, testified that J. Harden usually accompanied Burns when Burns delivered the crack cocaine. The three grams of crack cocaine that Porter sold to an undercover police officer when he was arrested came from Burns. After Porter was subpoenaed to testify in the federal grand jury investigation, Burns told him to deny purchasing crack cocaine from him, and to tell the grand jury that they knew each other only because they played basketball together.

Green purchased crack cocaine from Burns, which he would then resell, from October of 1997 until the spring of 1998. J. Harden and Jordon were observed by Green carrying and selling crack cocaine during this period of time. In the spring of 1998, Green paid A. Harden $200 for selling two grams of crack cocaine on Green's behalf.

Keene, one of Burns's largest distributors, purchased five to six ounces of crack cocaine from Burns on a daily basis, or approximately one kilogram of crack cocaine each week, from April of 1998 until his arrest on drug charges in September of that year. In total, Keene bought at least 24 kilograms of crack cocaine from Burns, for which Keene paid between $20,000 and $24,000 per kilogram. Keene also saw Jordon sell crack cocaine at least a dozen times. Burns, who lived in Clifton, Ohio, typically traveled with A. Harden, J. Harden, Jordon, or Green to make crack cocaine deliveries to Keene's residence in Covington, Kentucky. Burns rarely possessed the drugs himself; instead, he had either A. Harden, J. Harden, or Jordon carry them on his behalf.

Trujillo bought, in total, approximately two kilograms of crack cocaine from Burns between May and August of 1998. He observed that J. Harden or Jordon typically delivered the crack cocaine to him on Burns's behalf.

Walker received deliveries of crack cocaine once or twice a week, for which Burns received $700 per ounce, from 1997 until Walker's arrest in May of 1998 for possessing crack cocaine that he had bought from Burns. According to Walker, these deliveries were made by either Burns, J. Harden, or Jordon.

## C. Facts relating to Counts 5, 6, 7, and 8

While incarcerated and awaiting the trial of his case, Keene agreed to cooperate with the government by contacting Burns in an attempt to dispose of an amount of crack cocaine that Keene had hidden at his residence. Keene called Burns from the detention center on January 22, 1999. During the recorded conversation, Keene agreed to return to Burns 30 ounces of crack cocaine that Burns had provided him prior to Keene's arrest. Burns told Keene that he would pick up the drugs from Keene's associate, an undercover agent, that evening, as payment for a $14,000 debt that Keene owed Burns.

sentenced to terms of imprisonment that are less than the 20-year maximum sentence they faced without regard to the amount of crack cocaine for which they were held responsible. Their sentences on Count 2 are therefore valid under the pre-*Apprendi* case of *McMillan v. Pennsylvania*. 477 U.S. 79, 84, 91 (1986) (holding that a state need not prove beyond a reasonable doubt facts that, while unnecessary to prove the elements of the charged offense, do affect the degree of culpability to be considered in determining the severity of the punishment); *Apprendi*, 530 U.S. at 487 n.13 ("We do not overrule *McMillan*. We limit its holding to cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict . . . .").

The sentences that A. Harden, J. Harden, and Jordon received on Counts 3 and 4 run concurrently with their sentences on Count 2, and do not add any length to the overall terms of imprisonment. Any *Apprendi* error that the district court might have committed in determining the amount of drugs applicable to Counts 3 and 4 is therefore harmless, because it would not affect the defendants' substantial rights. *United States v. Rivera*, 282 F.3d 74, 77-78 (2d Cir. 2002) (per curiam) (holding that because the defendant's life sentence for having engaged in a continuing criminal enterprise was within the statutory maximum for that offense, any *Apprendi* error in the imposition of concurrent sentences on other counts would be harmless).

Burns's *Apprendi* argument suffers from the same deficiency as those of his codefendants. The life sentence that Burns received on Count 1 (engaging in a continuing criminal enterprise) is within the statutory maximum for that offense without regard to the amount of drugs involved. 21 U.S.C. § 848(a). As a result, Burns's sentence on Count 1 does not violate *Apprendi*. *Rivera*, 282 F.3d at 77-78. Furthermore, because the life sentence that Burns received on Count 8 (attempting to possess with the intent to distribute 30 ounces of crack cocaine) runs concurrently with the sentence that he

But *Apprendi* "is not triggered" where the defendant receives a term of imprisonment within the statutory maximum that would have applied even without the enhancing factor (such as the drug amount). *United States v. Corrado*, 227 F.3d 528, 542 (6th Cir. 2000) (holding that *Apprendi* did not apply where the defendants' sentences were enhanced based on a fact that the judge found by a preponderance of the evidence, because even with the enhancement, the sentences imposed were below the statutory maximum for the convictions established by the jury's verdict). Nor does *Apprendi* apply where a fact not found by the jury increases the lower limit of the sentencing range, as long as the sentence actually imposed is less than the upper limit of the range. *United States v. Harris*, 122 S.Ct. 2406, __ U.S. __, 2002 U.S LEXIS 4652, *39 (2002) (holding that a fact that increases the lower limit of the sentencing range, but not the upper limit, need not be found by the jury under *Apprendi* because "[t]he Fifth and Sixth Amendments ensure that the defendant "will never get *more* punishment than he bargained for when he did the crime, but they do not promise that he will receive anything less than that") (internal quotation marks and citation omitted) (emphasis in original).

A. Harden, J. Harden, and Jordon were each convicted on Count 2 (conspiracy to possess with the intent to distribute cocaine base in violation of 21 U.S.C. § 846). The penalties for a violation of § 846 are determined pursuant to 21 U.S.C. § 841, which provides, in pertinent part, that "[i]n the case of a controlled substance in schedule I or II, . . . such person shall be sentenced to a term of imprisonment of not more than 20 years." 21 U.S.C. § 841(b)(1)(C). Schedule II includes crack cocaine. 21 C.F.R. § 1308.12. As a result, a defendant convicted of conspiring to distribute any quantity of crack cocaine, no matter how low, is subject to a maximum sentence of 20 years in prison. 21 U.S.C. § 841(b)(1)(C).

Of the three defendants sentenced on Count 2, A. Harden received the longest sentence—188 months—which is less than 16 years. A. Harden, J. Harden, and Jordon were thus

During a second recorded telephone call, Officer Steve Ellison posed as Keene's brother-in-law, Charles. Ellison agreed to deliver the 30 ounces of crack cocaine to Burns near a Taco Bell restaurant in Covington. Burns arrived at the meeting place 15 minutes early, where the police who were stationed nearby observed him conducting counter-surveillance. When Burns spotted the police presence, he left the area and skipped the meeting. After the meeting time had passed, Ellison called Burns again. Burns accused Keene of "tryin' to set me up." Ellison told Burns that he was going to "throw the s--- in the river," to which Burns responded, "throw the s---," but then claimed that he did not know what Ellison was talking about. Burns also denied knowing anyone named Charles, and abruptly hung up after saying, "tell your buddies I said hi."

### D. Facts relating to Count 9

Walker called Burns on February 9, 1999, after Walker had been served with a subpoena to testify before the grand jury investigating Burns and had agreed to cooperate with the government. During the recorded conversation, Walker asked Burns what he should say if he was asked about his suppliers before the grand jury. Burns told him to say, falsely: "You wasn't getting none from me . . . . Me and Antonio Burns just grew up together, we – we play sports together and he don't deal no drugs. I never knew him to deal no drugs. That what you tell them." Burns also told Walker to tell the grand jury that Keene, not Burns, was Walker's source of crack cocaine. Walker later assured Burns that he had lied to the grand jury as Burns had urged.

### E. Facts relating to Counts 3 and 4: the "Newport bar incident"

In an incident involving two of Burns's codefendants, but not Burns himself, Ryan Lloyd, who was cooperating with the local police, contacted Green in January of 1999 in order to buy crack cocaine. Although Green did not have any crack

cocaine at the time, he negotiated a deal on Jordon's behalf for $400, with the drugs to be delivered at the Saratoga Bar in Newport, Kentucky later that day. Green told A. Harden that he needed to go to the bar to consumate a drug deal. A. Harden agreed to drive Jordon, Green, and Eugene West to the bar. When they arrived at the bar, A. Harden and Jordon stayed in the car while Green and West went in to complete the sale. Green sold Lloyd the crack cocaine for $400, but moments later West robbed Lloyd at gunpoint. Lloyd escaped to a police surveillance vehicle, and Green and West ran to their car. The police stopped the car as A. Harden attempted to drive away. In the car, officers found $4,000 in cash and a firearm under A. Harden's seat, and $5,000 in additional cash in the glove compartment. A. Harden told Tony Wall, one of the arresting officers, that he had been paid to drive the others to do a drug deal, and that he had driven on other such deals.

**F.    Facts relating to Burns's and J. Harden's motions to suppress evidence**

On March 20, 1998, the Newport, Kentucky police stopped Burns's car after Baldwin informed them that Burns was driving without a valid driver's license. When Burns, who was driving alone, produced a fake Ohio driver's license, the officers arrested him for possessing a forged instrument. Burns was handcuffed and read his *Miranda* rights. Following his arrest, the officers searched Burns's car. The magistrate judge found that Burns had consented to the search, based upon the testimony of the officers on the scene. In the passenger compartment, the officers found two of J. Harden's paychecks and a piece of paper showing eight names paired with dollar amounts. The officers also confiscated $1,780 that they found on Burns's person. Burns, in an effort to dissuade the officers from suspecting that he was dealing drugs, invited them to search the hotel room where he and Jordon were staying. After knocking and announcing their presence, the officers used the key that Burns had provided to enter the room, where they found J.

instruction, the defendant's right to a fair trial is compromised. *United States v. Haywood*, 280 F.3d 715, 724, 725 (6th Cir. 2002), citing *United States v. Garcia-Rosa*, 876 F.2d 209, 222 (1st Cir. 1989) (vacated in part on other grounds) (holding that the prejudicial effect of the admission of the defendant's prior bad acts was so severe that it could not "be remedied merely through a limiting instruction").

In the present case, however, the potential prejudicial effect of the slides was not so great as to overwhelm the jury's ability to follow the court's instructions not to consider the opening statements as evidence. Moreover, given the overwhelming evidence of the defendants' guilt presented during the subsequent nine days of trial, any error in permitting the slides to be shown during the government's opening statement was harmless.

**C.    Sentencing**

*1.    Apprendi*

All four of the defendants argue that the district court violated their rights under the Sixth and Fourteenth Amendments by not requiring the jury determine, beyond a reasonable doubt, the amount of crack cocaine for which they were being held responsible, with the judge instead making that determination at sentencing using a preponderance of the evidence standard. They contend that the case of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), supports their position. In *Apprendi*, the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. *Apprendi* further held that "[i]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." *Id.* (internal quotation marks and citation omitted).

text, the presentation was permissible. The jury was instructed before the opening statements that the statements were not evidence, a point that the court reiterated in its final instructions.

An opening statement is designed to allow each party to present an objective overview of the evidence intended to be introduced at trial. *United States v. Brockington*, 849 F.2d 872, 875 (4th Cir. 1988). It is not appropriate for a prosecutor to "use the opening statement to poison the jury's mind against the defendant or to recite items of highly questionable evidence." *Id.* (internal quotation marks and citations omitted).

"Appellate courts review a district judge's conduct of a trial, including the conduct of opening statement, for abuse of discretion." *Cox v. Treadway*, 75 F.3d 230, 237 (6th Cir. 1996). We will find an abuse of discretion only upon a "definite and firm conviction that the trial court committed a clear error of judgment." *Cincinnati Ins. Co. v. Byers*, 151 F.3d 574, 578 (6th Cir. 1998) (quoting *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989)). Furthermore, even if the district court erred in allowing the Power Point presentation, reversal would be warranted only if the presentation's effect on the defendants was prejudicial. Fed. R. Crim. P. 52(a). That is, the opening statement presentation must have affected the defendants' substantial rights. *Id.*

Although the photographs of large amounts of crack cocaine and the fistfuls of money might have confused the jury as to the actual amounts of drugs or money at issue in the case, we presume that the district court's instructions against viewing the opening statements as evidence cured any harm that might have been caused. *United States v. Neuhausser*, 241 F.3d 460, 469 (6th Cir. 2001) (explaining that a jury is presumed to have followed a clear instruction). The presumption is overcome only where evidence has been admitted that is so prejudicial that, even with a limiting

Harden lying on the bed. In the room, the officers found two plastic bags with cocaine residue.

On July 2, 1998, two Covington, Kentucky police officers responded to a report of seeing a juvenile "male black . . . wearing all red clothes . . . armed with a large revolver" in an area notorious for drug-trafficking activity. Upon arriving at the scene, one of the officers noticed a person appearing to fit this description. Burns, J. Harden, Jordon (dressed in a red shirt), and Green, upon seeing the officers, got into a car that was registered to Burns under a fictitious name and identified by the police dispatcher as a vehicle previously associated with drug activity. The officers stopped the car and, as they approached, recognized J. Harden as the driver. J. Harden did not have a driver's license, which the dispatcher confirmed while the officers were on the scene. The officers then arrested J. Harden for driving without a license, and ordered everyone in the car to keep their hands on the seats in front of them as the officers looked for weapons. Green, however, kept his hand on the back seat so as to partially cover a plastic bag, which upon inspection contained 16.8 grams of crack cocaine. The officers proceeded to conduct a full search of the car and its occupants. They found $5,080 in the glove compartment, a handgun and ammunition in the trunk, and $402 and a pager on J. Harden's person.

## II. ANALYSIS

### A. Sufficiency of the evidence

In determining whether the evidence presented at trial is sufficient to support a conviction, "[t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Kelly*, 204 F.3d 652, 656 (6th Cir. 2000) (emphasis in original) (internal quotation marks and citation omitted). All reasonable inferences are to be drawn in the government's favor. *Id.* Moreover,

"[s]ufficiency-of-the-evidence appeals are 'no place . . . for arguments regarding a government witness's lack of credibility.'" *United States v. Hernandez*, 227 F.3d 686, 694 (6th Cir. 2000) (citations omitted).

### 1.   *Count 1: continuing criminal enterprise*

"In order to convict a defendant of engaging in a continuing criminal enterprise, the United States must prove: (1) that the defendant committed a felony violation of federal narcotics laws; (2) that the violation was part of a continuing series of three or more drug offenses committed by the defendant; (3) that the defendant committed the series of offenses in concert with five or more persons; (4) that the defendant acted as an organizer, supervisor, or manager with regard to these five or more persons; and (5) that the defendant obtained substantial income or resources from this series of violations." *United States v. Avery*, 128 F.3d 966, 973 (6th Cir. 1997); 21 U.S.C. § 848(c). Burns argues that the government failed to offer sufficient evidence to establish any of these elements.

Regarding the first two elements, the testimony of Baker, Baldwin, Green, Keene, Porter, Trujillo, and Walker provided overwhelming evidence that Burns distributed crack cocaine as part of a continuing series of three or more offenses. From Keene's testimony alone, the jury heard that Burns sold crack cocaine to him on a daily basis from April of 1998 through September of that year, amounting to approximately one kilogram of crack cocaine per week. The jury also heard that Burns sold crack cocaine to Baldwin, Green, Porter, Trujillo, and Walker from late 1997 until early 1999. Each of these dozens of transactions constituted a separate violation of 21 U.S.C. § 846.

Faced with this volume of evidence, Burns argues that the indictment was constitutionally defective because it did not allege three specific drug transactions as forming the basis for the "continuing series" element. But "[a]n indictment

might be in the car. They were therefore justified in searching the car beyond the passenger compartment.

J. Harden's motion to suppress the evidence found in Burns's motel room on March 20, 1998 was likewise properly denied, because Burns had "common authority or control" over the room that allowed him to consent to a search. The Supreme Court has defined "common authority or control" as

> [the] mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their members might permit the common area to be searched.

*United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974). The concept of "common authority or control" enables a cooccupant such as Burns to consent to a search if that party has the right to use or possess the property. Burns rented the room, had a key, and was the sole registered occupant. He therefore had the right to use or possess the room and the ability to consent to a search regardless of J. Harden's presence there.

### 2.   *The Power Point presentation*

The defendants next argue that the district court erred in permitting the government, over the their objection, to use a Power Point slide presentation in the government's opening statement. While the U. S. Attorney spoke, various drawings, photographs, icons, and text appeared on a screen. Some of the images depicted items that were not intended to become evidence in the case, most notably photographs of a large amount of crack cocaine and fistfuls of money. Prior to trial, the government had advised the defendants of its intention to use this presentation during its opening statement and provided them with copies of each slide. After viewing the presentation, the district court ruled that as long as there would be evidence about each image that appeared with the

regarding the suspected criminal activity, and a cursory search for weapons to protect the officer's safety. *Terry*, 392 U.S. at 30-31.

In the present case, the car that J. Harden was driving (owned by Burns) was pulled over because the officers observed it leaving an area notorious for drug activity, and because it was carrying a black male dressed in red who appeared to fit the description of an individual reported to be a juvenile brandishing a large revolver. It is illegal in Kentucky for a juvenile to brandish a firearm. Ky. Rev. Stat. Ann. § 527.100 (Michie 1999). This information, combined with the dispatcher's report that the car had been involved in drug trafficking and was in an area known for such activity, provided the officers with a reasonable suspicion of criminal activity sufficient to justify the stop.

Once the car was stopped, the fact that one of the passengers was thought to have a gun provided the officers with a reasonable suspicion to believe that a weapon might be present. The officers were therefore entitled to conduct a limited search for weapons under *Terry*. The seizure of the bag of crack cocaine that was partially concealed by Green's hand in the back seat was justified because the bag was seen in plain view. If the police discover contraband in plain view during a legitimate *Terry* search of an automobile, the Fourth Amendment does not require them to ignore it. *United States v. Walker*, 181 F.3d 774, 778 (6th Cir. 1999). Instead, such an item may be seized without a warrant. *Id.* at 778-79.

The firearm and ammunition found in the trunk of the car were also properly seized. An officer may conduct a warrantless search of every part of a legitimately stopped vehicle, including the trunk and all containers, if there is probable cause to believe that the vehicle contains contraband. *United States v. Ross,* 456 U.S. 798, 825 (1982). Once the bag of crack cocaine was found in plain view, the officers had probable cause to believe that other contraband

charging a [continuing criminal enterprise] is sufficient for constitutional purposes if it articulates in statutory language the elements of the violation." *United States v. Lehder-Rivas*, 955 F.2d 1510, 1519 (11th Cir. 1992) (internal quotation marks and citation omitted) (alteration in original). The indictment charged all of the essential elements of the continuing-criminal-enterprise offense and made clear that the government intended to prove a conspiracy that included at least three drug violations from November of 1997 to January of 1999. Each of the uncharged predicate acts occurred during the period specified in the charge. Burns was given advance notice of the acts and the names of the witnesses who would testify against him. As a result, the indictment was not defective.

Burns also claims that the jury was not properly instructed regarding the continuing-criminal-enterprise charge. "[A] jury in a federal criminal case brought under § 848 must unanimously agree not only that the defendant committed some 'continuing series of violations' but also that the defendant committed each of the individual 'violations' necessary to make up that 'continuing series.'" *Richardson v. United States*, 526 U.S. 813, 815-16 (1999) (holding that the district court erred in instructing the jury that "[y]ou do not . . . have to agree as to the particular three or more federal narcotics offenses committed by the defendant").

In the present case, the jury was instructed that it must "unanimously agree to at least three related violations underlying this continuing criminal enterprise charge." The instruction thus stands in contrast to the incorrect language in *Richardson* to the effect that the jury need not agree as to the particular three offenses. Rather, by requiring the jury to unanimously agree to "at least three related violations," the instruction at issue properly made clear to the jury that it must unanimously find that Burns committed the same three (or more) violations.

Regarding elements three and four, the evidence at trial was, again, overwhelming. Baker's testimony alone provided evidence that four people—A. Harden, J. Harden, Jordon, and Eugene West—packaged and sold crack cocaine under Burns's direction, and that a fifth, Tio West, also sold crack for Burns. She further testified that Burns supervised A. Harden, J. Harden, Jordon, and Eugene West while they weighed and packaged crack cocaine at Baker's apartment during the summer of 1998. Baldwin testified that a sixth individual, Burns's girlfriend "Tia," also delivered crack on Burns's behalf. Keene stated that, in addition to A. Harden, J. Harden, and Jordon, Burns traveled with a seventh coconspirator, Green, to make crack cocaine deliveries. From this evidence and the testimony of all the other witnesses, the jury could reasonably conclude that Burns committed the series of offenses in concert with five or more individuals that he organized, supervised, or managed.

The fifth element of the continuing-criminal-enterprise offense is supported by the testimony of Keene and Walker, among others. Keene paid Burns between $20,000 and $24,000 for each kilogram of crack cocaine that he bought from Burns over a period of five months. In total, Keene bought at least 24 kilograms of crack cocaine from Burns. When Burns posted Walker's bond, Burns showed Walker $24,000 in cash. Walker paid Burns $700 per ounce for crack cocaine delivered to Walker at least once a week from late 1997 until May of 1998. Baker testified that Burns wore nice clothing and jewelry and, even though he did not have a job, owned two cars, several cell phones, and a pager. Burns bought jewelry and other gifts for one of his girlfriends, Cassie McKnight, and paid cash for the bonds of Baldwin and Walker. The jury could have found, based on this evidence, that Burns derived substantial income from his continuing criminal activity.

officers regarding the calm and cordial nature of the interaction with Burns is uncontroverted, and the taped portions of the conversation in which Burns consented to the later motel search supports that testimony. As a result, the government met its burden of proving by a preponderance of the evidence that voluntary consent was obtained from Burns.

The further search of Burns's motel room was also justified by his consent. A recording was made, with Burns's approval, by one of the arresting officers of the portion of the conversation in which Burns gave his consent to search the motel room. In that exchange, Burns engaged in a friendly conversation, and there is no hint that he was coerced in any way. Although Burns was handcuffed (because of his arrest for the fake driver's license) when he led the officers to the room and permitted them to use his key to open the door, Burns's consent was not invalidated simply because he was in custody at the time that he gave it. *United States v. Watson*, 423 U.S. 411, 424 (1976) (holding that the defendant had not been coerced into consenting to a search, even though he had been arrested and was in police custody at the time). Burns was not confined in the police station when he gave his consent, and he was not physically threatened. As a result, there is no reason to believe that Burns's consent was involuntary. The two plastic bags found in the motel room were therefore seized pursuant to a valid search.

Turning next to J. Harden's motion to suppress the evidence found in the car that he was driving on July 2, 1998, this stop differs from the March 20, 1998 incident because it was not based upon probable cause to believe that a traffic violation had occurred. Instead, the stop was made to investigate a non-traffic-related crime. "[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 30 (1968)). Such an investigative stop, however, is limited to questioning

Amendment—subject only to a few specifically established and well delineated exceptions." *Thompson v. Louisiana*, 469 U.S. 17, 19-20 (1984) (citation omitted). None of the searches or seizures at issue were done with prior judicial permission. As a result, they must be justified under one of the exceptions to the presumption of *per se* unreasonableness in order to be sustainable.

Turning first to Burns's motion, "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). The officer who stopped Burns had the necessary probable cause on March 20, 1998 because Baldwin, who knew Burns personally, had described Burns's car to the police and had informed them that Burns did not have a valid driver's license.

Burns's consent justified the subsequent search of his car. "A search may be conducted without a warrant if a person with a privacy interest in the item to be searched gives free and voluntary consent." *United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996). "It is the Government's burden, by a preponderance of the evidence, to show through 'clear and positive testimony' that valid consent was obtained." *Id.* The magistrate judge weighed the testimony of the officers on the scene against the testimony of Burns, and found that the consistency of the officers' recollection of Burns's consent was more credible than Burns's "more argumentative than earnest" statements to the contrary, and concluded that Burns had in fact allowed the officers to search his car in an effort to dissuade them from suspecting that he was dealing drugs. Burns has provided us no reason to conclude that the magistrate's factual finding in this regard was clearly erroneous.

The remaining issue is whether the consent was given voluntarily, or whether it was the result of coercion. We "will determine whether consent is free and voluntary by examining the totality of the circumstances." *Id.* The testimony of the

### 2. Count 2: conspiracy

In order to establish a conspiracy under 21 U.S.C. § 846, "the government must prove the existence of an agreement to violate the drug laws and that each conspirator knew of, intended to join, and participated in the conspiracy." *United States v. Gaitan-Acevedo*, 148 F.3d 577, 586 (6th Cir. 1998) (citation omitted). Each defendant "need not have had knowledge of every phase of the conspiracy to have intended to facilitate the common scheme." *Id.* (holding that the evidence of conspiracy against the defendant was sufficient because he knew that his criminal conduct was connected in some way to the success of the collective venture).

From the testimony of Baker, Baldwin, Green, Keene, Porter, Trujillo, and Walker, the jury was presented with ample evidence that A. Harden, J. Harden, and Jordon possessed and distributed crack cocaine in concert with Burns and one another. These witnesses described, as set forth above in Part I.B., a consistent method of operation, whereby Burns and his codefendants conspired to possess, sell, and package the drugs. The claims of A. Harden, J. Harden, and Jordon that they were innocently associated with Burns are thus contradicted by substantial evidence at trial.

J. Harden, who became an adult on March 25, 1998, also argues that the government failed to prove that he ratified his membership in the conspiracy after he became an adult. "A defendant who enters a conspiracy prior to his eighteenth birthday can be tried as an adult if he continues in the conspiracy after that time." *United States v. Odom*, 13 F.3d 949, 957 (6th Cir. 1994). The conspiracy allegedly existed from November of 1997 through January 4, 1999. J. Harden argues that the only evidence of his participation in the alleged conspiracy after he became an adult was as a result of the July 2, 1998 stop of Burns's car, which J. Harden argues was without probable cause and therefore in violation of the Fourth Amendment.

The admissibility of the evidence arising from the July 2, 1998 incident is discussed below in Part II.B.1. Even if J. Harden's motion to suppress were granted, however, the evidence of his participation in the conspiracy after he became an adult is as plentiful as that of his conduct as a minor. Trujillo observed that J. Harden drove Burns to sell crack cocaine to Trujillo, and J. Harden also made deliveries to Trujillo on his own. Baker said that after March of 1998, J. Harden possessed crack cocaine in her apartment, assisted Burns in finding and selling crack cocaine to customers, and sold crack cocaine to Baker until she was arrested in September of 1998. She also saw J. Harden possess crack cocaine at Burns's residence in November of 1998, as did Green. On the basis of the above evidence, the jury could reasonably have concluded that J. Harden ratified his participation in the conspiracy after he became an adult.

### 3.    *Count 3: possessing with the intent to distribute one-half ounce of crack cocaine*

A. Harden's and Jordon's argument that the evidence was insufficient to prove the elements of a violation of 21 U.S.C. § 841(a)(1)—that they (1) knowingly possessed one-half ounce of crack cocaine (2) with the intent to distribute the same—is refuted by the record set forth above in Part I.E. concerning the Newport bar incident. Jordon supplied the crack cocaine that Green sold to Ryan Lloyd. With drugs in the car, A. Harden drove Green to the site of the deal. A. Harden's prior knowledge of the trip's purpose was shown by the fact that Green told him that he needed to go to the bar to consummate a drug deal, as well as A. Harden's admission that he had been paid to drive to the Newport bar from Cincinnati for that purpose.

### 4.    *Count 4: traveling in interstate commerce to commit an unlawful act, or aiding and abetting the same*

Count 4 of the indictment charged that A. Harden and Jordon violated the Travel Act, 18 U.S.C. § 1952(a)(3). The

federal criminal trials and grand jury sessions." *United States v. Lara*, 181 F.3d 183, 200 (1st Cir. 1999). That Burns intended to influence Walker's testimony is shown by the fact that the idea for Walker to lie came solely from Burns, and they discussed the fact that Walker would soon be testifying before the grand jury.

## B.    Evidentiary issues

### 1.    *Burns's and J. Harden's motions to suppress*

Burns sought to suppress the evidence found in his car and motel room on March 20, 1998. J. Harden sought to suppress the evidence found in Burns's motel room, where he was staying at the time of the March 20 search, as well as the items taken from Burns's car on July 2, 1998, which J. Harden was driving at the time it was stopped and searched. In reviewing a district court's ruling on a motion to suppress evidence, we apply the "clearly erroneous" standard to the district court's factual findings, and review its legal conclusions de novo. *United States v. Roberts*, 986 F.2d 1026, 1029 (6th Cir. 1993). Accordingly, we review de novo the district court's legal conclusion that neither Burns's nor J. Harden's Fourth Amendment rights were violated in the searches.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. In order to succeed on a motion to suppress, the movant must show that "he manifested a subjective expectation of privacy in the object of the challenged search" and that "society is prepared to recognize that expectation as legitimate." *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988) (citation omitted). Searches or seizures that both intrude upon such legitimate expectations of privacy, and are "conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth

testimony regarding Burns's extensive drug distribution activities, the jury could also reasonably have concluded that Burns intended not only to possess the 30 ounces of crack cocaine, but also to distribute them.

Burns's negotiations to possess the drugs during the recorded conversation with Keene and the first recorded conversation with undercover agent Ellison also constituted a substantial step toward the completion of the offense. *Id.* ("[W]e hold that when a defendant engages in active negotiations to purchase drugs, he has committed the 'substantial step' towards the crime of possession required to convict him of attempted possession."). The act of going to the Taco Bell restaurant 15 minutes ahead of the agreed-upon meeting time for the drug transfer was a second substantial step toward the completion of the offense, even though the police presence in the vicinity led him to skip the meeting. "A defendant may be found to have taken a 'substantial step' for the purpose of an attempt conviction even though he or she has failed to gain possession of drugs or 'sham' drugs." *Id.* By going to the restaurant at the time that the transfer was to occur, Burns acted in a manner that manifested a firm intent to complete the crime.

### 7. *Count 9: corruptly attempting to persuade and influence a witness in an official proceeding*

Burns's challenge of his conviction for attempting to persuade Walker to lie before the grand jury is also without merit. In order to prove this charge, the government must establish that Burns attempted to (1) corruptly persuade (2) a witness in an official federal proceeding (3) with the intent to influence that witness's testimony. 18 U.S.C. § 1512(b)(1). The facts fully support the jury's verdict on this count. Burns attempted to "corruptly persuade" Walker by urging him to lie about the basis of their relationship, to deny that Walker knew Burns as a drug dealer, and to disclaim that Burns was Walker's source of crack cocaine. Walker was a witness in an "official proceeding," because that term "encompasses both

Travel Act has three elements: (1) that the defendant "travels in interstate or foreign commerce" (2) "with intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity" and (3) that the defendant "thereafter performs or attempts to perform" an act of promotion, management, establishment, or carrying on of any unlawful activity. 18 U.S.C. § 1952(a)(3). Jordon argues that the government failed to offer proof of the third element—that an overt act occurred after he had traveled across state lines from Ohio to Kentucky.

In support of this argument, Jordon contends that his conduct was similar to that of the defendant in *United States v. Zolicoffer*, 869 F.2d 771, 775 (3d Cir. 1989), who was held not to have violated the Travel Act when he traveled from Florida to Pennsylvania in order to collect a drug debt. Zolicoffer was arrested upon entering the Harrisburg airport terminal, before he had committed an overt act in Pennsylvania. Jordon similarly argues that he did not violate the Travel Act because his failure to receive payment from the drug sale in the Newport bar prevented the intended unlawful act from being consummated. But *Zolicoffer* does not stand for the proposition that the intended illegal act must be consummated after arrival in the second state. To the contrary, the *Zolicoffer* court made clear that its holding should not be interpreted "to say that the government must prove that the defendant committed an illegal act after the travel," but only that "a plain reading of the statute shows that it must prove *some conduct after the travel in furtherance of the unlawful activity*." *Id.* (emphasis added) (internal citation omitted).

Unlike the defendant in *Zolicoffer*, who was arrested before he met with any associates in Pennsylvania or did anything else there in relation to his intended crime, Jordon committed an overt act after his travel to Kentucky in furtherance of the unlawful activity. Green's testimony provided evidence that Jordon, with full knowledge of Green's purpose, distributed

the drugs to Green in Ohio so that he could sell them to Lloyd in Kentucky. Jordon then traveled to Kentucky in order to complete the deal. In Kentucky, with Jordon waiting in the car, Green transferred the drugs to Lloyd in the Saratoga Bar, and Lloyd paid Green in return, before the police stepped in. By associating with Green in Kentucky and by remaining in the car that Green intended to use to leave the scene of the drug sale at the Newport bar, Jordon placed himself in the position to (1) receive immediate payment from Green after the sale in Kentucky, (2) provide surveillance support, and (3) physically aid Green should any danger arise. Thus Jordon acted, while in Kentucky, in furtherance of the intended unlawful act there. As a result, the jury had before it sufficient evidence to convict Jordon under the Travel Act.

### 5.   *Counts 5, 6, and 7: using a communications facility in the commission of a federal crime*

Burns's claim that the evidence was insufficient to support his convictions on Counts 5, 6, and 7 also fails in light of the facts set forth above in Part I.C. To prove a violation of 21 U.S.C. § 843(b), the government must establish that Burns (1) "knowingly and intentionally used a communications facility" (2) "to facilitate the commission of a [federal] narcotics crime." *United States v. Mertilus*, 111 F.3d 870, 872 (11th Cir. 1997).

Burns used the telephone to negotiate his receipt of 30 ounces of crack cocaine as payment for a $14,000 debt during the recorded call with Keene and the first recorded call with undercover agent Ellison on January 22, 1998. Because Burns obviously knew that he was using the telephone, and because the knowing or intentional possession of crack cocaine is a federal crime under 21 U.S.C. § 844, both elements of the government's case were sufficiently established to enable the jury to convict.

But Burns argues that even if the evidence was otherwise sufficient on this count, his conviction should be vacated

because the district court denied his request for a jury instruction on his entrapment defense. A defendant "is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment." *United States v. Khalil*, 279 F.3d 358, 364 (6th Cir. 2002) (internal quotation marks omitted). Two elements must be shown to establish a valid entrapment defense: "(1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant to engage in the criminal activity." *Id.* "Where the evidence clearly and unequivocally establishes that [the defendant] was predisposed, the district court is justified in denying an entrapment instruction." *Id.* at 365 (internal quotation marks omitted) (alteration in original). Because the evidence recited above in Part I.B. regarding Burns's activities in 1998 firmly establishes his predisposition to traffic in crack cocaine before the recorded call from Keene in January of 1999, the district court did not err in denying Burns's request for the entrapment instruction.

### 6.   *Count 8: attempting to possess with the intent to distribute 30 ounces of crack cocaine*

"For an individual to be convicted of an attempt crime, the government must demonstrate a defendant's intent to commit the proscribed criminal conduct together with the commission of an overt act that constitutes a substantial step towards commission of the proscribed criminal activity." *United States v. Bilderbeck*, 163 F.3d 971, 975 (6th Cir. 1999). A "substantial step" is defined as "conduct strongly corroborative of the firmness of the defendant's criminal intent." *Id.* (citation omitted).

The government provided the jury with substantial evidence of Burns's specific intent to possess the 30 ounces of crack cocaine through the recorded conversation with Keene. In that conversation, Burns clearly expressed his desire to accept the drugs as payment for Keene's debt to Burns. Based on the large quantity involved in this transaction, as well as the