*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0396P (6th Cir.)
File Name: 02a0396p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

  *v.*

RICHARD CHARLES
BARTHOLOMEW (00-1899),
WARREN GENE HARRIS
(00-2453), and JULEEN
NICOLE HENRY (01-1614),
  *Defendants-Appellants.*

Nos. 00-1899/
2453; 01-1614

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 98-50065—Paul V. Gadola, District Judge.

Argued: September 18, 2002

Decided and Filed: November 15, 2002

Before: SILER, DAUGHTREY, and GILMAN, Circuit
Judges.

1

———————————

**COUNSEL**

———————————

**ARGUED:** Joan E. Morgan, Troy, Michigan, Michael M. Losavio, Louisville, Kentucky, James L. Feinberg, Detroit, Michigan, for Appellants. Mark C. Jones, ASSISTANT UNITED STATES ATTORNEY, Flint, Michigan, for Appellee. **ON BRIEF:** Joan E. Morgan, Troy, Michigan, Michael M. Losavio, Louisville, Kentucky, James L. Feinberg, Detroit, Michigan, for Appellants. Mark C. Jones, ASSISTANT UNITED STATES ATTORNEY, Flint, Michigan, for Appellee.

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge. Richard Charles Bartholomew, Warren Gene Harris, and Juleen Nicole Henry were indicted for conspiracy to distribute marijuana. Harris was also indicted for possession with intent to distribute the drug. After a jury convicted the defendants on all counts, the district court sentenced them to various terms of imprisonment. Bartholomew, Harris, and Henry now appeal, claiming that the district court committed numerous errors relating to their convictions and sentences. For the reasons set forth below, we **AFFIRM** the convictions and sentences of Harris and Henry, **AFFIRM** the conviction of Bartholomew, but **VACATE** Bartholomew's sentence and **REMAND** his case for resentencing.

## I.  BACKGROUND

**A.  Factual background**

On December 23, 1998, the United Parcel Service (UPS) office in Flint, Michigan received a package that aroused the suspicion of UPS employee Brian LaFalce. He contacted

imprisonment under these circumstances seriously affects the fairness of the judicial proceedings and constitutes plain error.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the convictions and sentences of Harris and Henry, **AFFIRM** the conviction of Bartholomew, but **VACATE** Bartholomew's sentence and **REMAND** his case for resentencing.

Sergeant A. J. Navidonski of the Flint Area Narcotics Group, a law enforcement agency of the state and county. After Navidonski examined the exterior of the package, he obtained a search warrant to look inside. When he opened the package, Navidonski discovered a tub that contained a substantial amount of marijuana. Laboratory tests later revealed that the precise amount was 12,115 grams (approximately 28 pounds).

Law enforcement officials decided to make a controlled delivery of the package. An undercover police officer, posing as a UPS driver, delivered the package to 729 West Dartmouth, Flint, Michigan, the address specified on the label. As other law enforcement officials set up surveillance, a man later identified as Harris emerged from the house at 729 West Dartmouth to answer the knock of the undercover officer. Harris signed the name "Billy Jones" and accepted the package.

Minutes after accepting delivery, Harris left the house through a back door. He traversed the neighborhood streets for thirteen minutes and spoke with no one during this time. Police officers who were continuing to observe Harris suspected that he was trying to ascertain whether he was, in fact, under surveillance.

After Harris circled back to 729 West Dartmouth, a four-door car arrived, and Harris got into the back seat on the passenger side. The car was driven by Jajuan Gardner, with Bartholomew and Cherron Wright as passengers. Police officers followed the car in an unmarked van. Gardner and Harris soon noticed that they were being followed. They sped up, but were unable to elude the van, so Gardner pulled into a tire store and stopped the car. The car's occupants all jumped out and started running.

Additional police officers arrived on the scene and apprehended Bartholomew, Gardner, Harris, and Wright. Bartholomew had $2,133 in cash on his person, Gardner was carrying $973, and Harris possessed $562. In addition, Harris

was carrying a pager that had very recently received a telephone call from the nearby Budgetel Inn. Bartholomew also had on his person, among other things, a traffic citation that listed his address in Houston, Texas, an address book containing many names, and a piece of paper with numerical calculations that the officers believed were drug tabulations. He informed the arresting officers that he was staying in Room 315 of the Budgetel Inn, which was confirmed by the hotel's records. The records also showed that Room 317 had been assigned to "McGartha Johnson," an alias for Jajuan Gardner.

Several police officers accompanied Bartholomew to Room 315 at the hotel. Bartholomew consented to the police searching the room, but the card key in their possession failed to unlock the door. The officers, however, "had information" that the adjacent room might be involved in drug trafficking. They therefore knocked on the door to Room 317 and announced that they were the police. A man inside, later identified as Otis James Jackson, acknowledged the knock. Two minutes later he opened the door and permitted the officers to enter the room to speak with him.

Once inside the room, the officers encountered a woman, later identified as Henry, who was naked below the waist. The officers instructed her to put on her clothes, which she promptly did. Jackson then consented to a search of the room.

One officer found a black suitcase beside the bed. Henry said that it was hers and that the officers could search it. The suitcase contained $31,700 in cash, packaged with rubber bands in $850 bundles. Another officer found an address book on a table in the room. Three pages of adhesive notes in the book contained sets of numbers, which the officer recognized as drug tabulations. The officers also discovered a coupon for Western Union, business cards from Philadelphia and Jamaica, prepaid telephone cards, several cards that they recognized as drug tabulation ledgers, a piece

the quantity had not been proved to a jury, met the first two criteria of plain-error analysis). The error also affected his "substantial rights," because it made a difference in "the outcome of the district court proceedings." *Cotton*, 122 S. Ct. at 1786. In *Cotton*, the Supreme Court assumed that the district court's failure to require the jury to determine the drug quantity beyond a reasonable doubt was an obvious error that affected the defendant's substantial rights, but held that because evidence of the drug quantity was "overwhelming" and "essentially uncontroverted," the error did not surmount the final hurdle of seriously affecting the fairness, integrity, or public reputation of the judicial proceedings. *Id.*

The circumstances of the present case are different. Evidence concerning the amount of marijuana that Bartholomew conspired to distribute was neither overwhelming nor essentially uncontroverted. For example, the government's witnesses could not state with certainty whether the four additional tubs in Harris's residence had contained marijuana. One law enforcement officer conceded that the tubs were not all the same color, and that he had inspected only one closely. Although evidence of the tubs supports a determination of drug quantity by a preponderance of the evidence (as was applied by the district court in determining Harris's sentence), it would not necessarily amount to proof of drug quantity beyond a reasonable doubt. Other evidence presented at trial as to the amount of marijuana involved in the conspiracy was also disputed by the defendants.

As the government concedes, the jury could have convicted Bartholomew based solely on the single UPS package delivered on December 23, 1998. That package contained approximately 28 pounds of marijuana. But if the jury had found only that amount to have been proved beyond a reasonable doubt, Bartholomew's sentence could not have exceeded 60 months' imprisonment. In sum, we conclude that sentencing Bartholomew to a term of 63 months'

1163647, at *1 (6th Cir. May 31, 2002) (per curiam) (unpublished table decision) ("The statutory maximum for distributing an undetermined amount of marijuana is five years."). Harris's sentence of 60 months' imprisonment, therefore, does not implicate his Fifth or Sixth Amendment rights. We note that, in any event, the evidence at trial was overwhelming that Harris's criminal conduct involved at least 28 pounds of marijuana, which is clearly more than a "small amount."

## I. The district court plainly erred in sentencing Bartholomew to 63 months' imprisonment

Bartholomew, in contrast to Harris, did receive a sentence of imprisonment in excess of the 60-month maximum prescribed by 21 U.S.C. § 841(b)(1)(D). But because he did not object at his sentencing to "the propriety of the evidentiary standard used by the district court in determining drug quantity," we will vacate his sentence only if it satisfies the "plain error" standard set forth in Rule 52(b) of the Federal Rules of Criminal Procedure. *United States v. Stewart*, __ F.3d __, Nos. 99-5615, 99-5850, 99-5852, 99-5853, 99-6248, 99-6249, 2002 WL 31010856, at *11 (6th Cir. Sept. 10, 2002) "Under that test, before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affect[s] substantial rights." *United States v. Cotton*, 122 S. Ct. 1781, 1785 (2002) (internal quotation marks omitted) (alteration in original). We may exercise our discretion to notice the error if these three conditions are met, "but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (alteration in original).

In light of *Apprendi*, sentencing Bartholomew to a term of imprisonment in excess of 60 months without the jury determining the quantity of drugs involved was an obvious error. *United States v. Cleaves*, 299 F.3d 564, 568 (6th Cir. 2002) (holding that sentencing a defendant in excess of the statutory maximum for an undetermined drug quantity, where

of paper on which was written "When you go through immigrations go to the baggage claim and collect your baggage," and a piece of paper on which was written the name "Michael Lewis" and the address "729 West Dartmouth."

Other officers searched the house at 729 West Dartmouth pursuant to the search warrant that they had obtained earlier that day. In the basement were four tubs that were similar to the one in the UPS package that the undercover officer had just delivered. A closet next to the stairs leading to the basement contained a shotgun and loose ammunition. Other firearms were found in an upstairs bedroom. The officers also discovered a notebook that contained what they believed were drug ledgers.

### B.  Procedural background

On January 6, 1999, the federal grand jury in the Eastern District of Michigan indicted Bartholomew, Gardner, Harris, Henry, and Jackson for conspiracy to distribute marijuana, in violation of 21 U.S.C. §§ 846 and 841(a)(1). It also indicted Harris for possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). The grand jury returned a first superceding indictment on April 14, 1999, which repeated the charges of the earlier bill, but specified that the conspiracy existed between approximately 1996 and December of 1998.

All defendants pled not guilty. Gardner proceeded to trial first and was convicted on May 24, 1999. The remaining four defendants were tried together. Just before the voir dire at their joint trial, the prosecutor agreed to dismiss the firearm count against Harris. The jury then heard testimony from various law enforcement officers that detailed their observations from the hotel and house searches. This testimony catalogued the items that the officers discovered and explained how those items connected Bartholomew,

Gardner, Harris, Henry, and Jackson to each other through names, nicknames, and telephone numbers, as well as common places and businesses. The jurors also heard from Gardner, who was called as a government witness.

Gardner told the jury of his dealings with Bartholomew, Harris, and Jackson. He described three occasions in October and November of 1998 when he purchased marijuana from Jackson in the basement of Harris's residence at 729 West Dartmouth. Although Jackson handled the marijuana, Harris participated in each transaction, either by directing Gardner to the basement or accepting payment. Gardner estimated that during the time he was dealing with Bartholomew, Harris, and Jackson, those three individuals and a couple of others trafficked in a total of between 100 and 400 pounds of marijuana.

The jury also heard testimony concerning events that took place outside of Michigan. Four are pertinent to this appeal. First, Pennsylvania State Police Officer Carlton Watson told the jurors that while working undercover in Philadelphia in the summer of 1997, he twice purchased marijuana from Jackson. Second, Juliet Brown, who was married to Bartholomew from 1995 to 1997, testified that when they were living together in Houston, Texas in 1996, she observed large quantities of marijuana in their home on several occasions. She also heard Bartholomew direct a third party to transport the drugs to Indiana on at least one of these occasions. Third, several witnesses related their experiences as couriers for Bartholomew and Jackson. Robin Caldwell, for example, told how Bartholomew paid her to transport large sums of cash between Indiana and Texas in the summer and fall of 1997 to facilitate his drug transactions. Two other couriers, Beatrice Boler and Kahlia Moore, stated that, on separate occasions in 1998, each had carried bundles of cash from Flint, Michigan to Houston, Texas at the behest of, and accompanied by, Bartholomew and Jackson. Finally, the government presented evidence concerning the activities of Rohan Edwards in Phoenix, Arizona. On July 9, 1998, law

marks omitted). The first question, then, is whether a term of 60 months exceeds the statutory maximum for a marijuana-conspiracy conviction where the amount of the drug is undetermined.

Harris argues that 21 U.S.C. § 841(b)(4) furnishes the applicable statutory maximum. That subsection provides that any person who violates the prohibition on possessing or distributing marijuana "by distributing a small amount of marihuana for no remuneration shall be treated as provided in section 844 of this title and section 3607 of Title 18." 21 U.S.C. § 841(b)(4). The maximum term of imprisonment under § 844 is one year. In contrast, the government contends that 21 U.S.C. § 841(b)(1)(D), which provides for a maximum sentence of five years "[i]n the case of less than 50 kilograms of marihuana," is the statutory maximum.

We believe that the government is correct. Because *Apprendi* is concerned with the *facts* that a jury must decide, "the proper 'baseline' or 'default' provision is not the provision with the lowest *penalty*, but rather the one which states a complete crime upon the fewest *facts*." *United States v. Outen*, 286 F.3d 622, 638 (2d Cir. 2002) (emphasis in original). Section 841(b)(4), therefore, cannot be the default provision for marijuana violations where the quantity of the drug is undetermined, because it requires proof of an additional fact—the absence of remuneration. *Id.* at 639; *accord United States v. Sellars*, No. 90-5987, 1991 WL 270821, at *2 (6th Cir. Dec. 19, 1991) (unpublished table decision) (declining to apply § 841(b)(4) because the superseding indictment charged the defendant with intent to distribute a measurable quantity of marijuana, not with either simple possession or the intent to distribute without remuneration).

We therefore conclude that § 841(b)(1)(D) is the statute that prescribes the maximum sentence for possessing or conspiring to distribute an undetermined amount of marijuana. *United States v. Jackson*, No. 00-1880, 2002 WL

minimal." U.S. Sentencing Guidelines Manual § 3B1.2, cmt. nn.1, 3 (1998). The determination of a defendant's culpability "is heavily dependent upon the facts, and the defendant has the burden of proving mitigating factors by a preponderance of the evidence." *United States v. Perry*, 908 F.2d 56, 58 (6th Cir. 1990) (internal citation and quotation marks omitted).

Harris was a fully integrated member of a substantial drug conspiracy that used his residence as a base of operations. He participated in several drug transactions that took place in his basement, stored a shotgun and ammunition in the closet near the stairs to his basement, and personally received at least one large shipment of marijuana. Harris was therefore not entitled to either a minor-role or a minimal-role reduction on these facts. The district court did not err in refusing to grant him such a reduction.

**H.  The district court did not err in sentencing Harris to 60 months' imprisonment**

Harris finally argues that the district court violated his rights under the Fifth and Sixth Amendments by not requiring the indictment to allege, and the jury to find beyond a reasonable doubt, the precise quantity of marijuana that he possessed or conspired to distribute. Instead, the judge determined the amount at sentencing. Harris makes the same argument with respect to the enhancement of his base offense level for possessing a firearm, because the judge, not the jury, found the fact of Harris's firearm possession.

The Supreme Court has held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). "But *Apprendi* is not triggered where the defendant receives a term of imprisonment within the statutory maximum that would have applied even without the enhancing factor (such as the drug amount)." *Burns*, 298 F.3d at 544 (internal quotation

enforcement officials located a substantial amount of marijuana at Edwards's townhouse. Immediately prior to his arrest, Edwards had been taken by associates to a hotel room in Tempe, Arizona that had been reserved by Henry.

On February 10, 2000, the jury convicted the remaining defendants on all pending charges. The district court then sentenced Bartholomew to 63 months' imprisonment. Harris received two concurrent 60-month sentences. Henry was sentenced to 115 days' imprisonment. Jackson's term of imprisonment was set at 84 months.

Bartholomew, Harris, Henry, and Jackson timely appealed the judgments against them. A previous panel of this court has already disposed of Jackson's appeal by vacating his sentence and remanding the case for resentencing. *United States v. Jackson*, No. 00-1880, 2002 WL 1163647 (6th Cir. May 31, 2002) (unpublished table decision). This leaves us with the appeals of Bartholomew, Harris, and Henry.

## II.  ANALYSIS

**A.  The district court did not err in denying Bartholomew's motion to suppress**

We begin with a challenge to a ruling by the district court in advance of the joint trial. Bartholomew moved the district court to suppress the evidence obtained by the police incident to his arrest. He argued that his Fourth Amendment rights were violated because the police had neither a warrant nor probable cause to arrest him. The district court disagreed, finding that the police had probable cause to arrest Bartholomew. "A district court's denial of a motion to suppress evidence is reviewed under a hybrid standard. Its findings of fact are reviewed under the 'clearly erroneous' standard, but its conclusions of law are reviewed de novo." *United States v. Orlando*, 281 F.3d 586, 593 (6th Cir.), *cert. denied*, No. 01-10665, 2002 WL 1307390 (U.S. Oct. 15, 2002).

After a police officer delivered the shipment of marijuana to Harris, other officers observed Harris exit his house and stroll the neighborhood in a manner suggesting that he was trying to determine whether he was under surveillance. Then a car drove by, and Harris got in. Police officers followed the vehicle in an unmarked van. The car containing Harris stopped, and its occupants fled. One of the fleeing occupants was Bartholomew. Bartholomew contests none of these facts as found by the district court. They are sufficient to support the court's determination that the police officers had probable cause to arrest Bartholomew. *See, e.g., United States v. Hughes*, 898 F.2d 63, 64-65 (6th Cir. 1990) (finding that an arrest for illegal drug activity was supported by probable cause where the suspect was present in an area known for drug trafficking, engaged in events consistent with drug trafficking, fled after seeing the police, and tried to conceal the subject of her activities).

**B.  The district court did not err in permitting the prosecutor to exercise peremptory challenges against potential jurors Adams, Chatmon, and Hicks**

We turn next to the defendants' objections relating to the composition of the jury. Bartholomew, Harris, and Henry claim that the prosecutor exercised his peremptory challenges in a racially and sexually discriminatory manner, in violation of the Equal Protection Clause. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) (prohibiting the exercise of sex-based peremptory challenges); *Batson v. Kentucky*, 476 U.S. 79 (1986) (prohibiting the exercise of race-based peremptory challenges). The prosecutor exercised peremptory challenges to exclude three black females from the jury venire: Jean Adams, Geraldine Chatmon, and Kimerly Hicks. Finding that the prosecutor did not strike these potential jurors for discriminatory reasons, the district court permitted their removal. Whether a party exercised its peremptory challenges in a discriminatory manner is a finding of fact, which we review under the clearly erroneous standard. *United States v.*

crime is a factual finding subject to the clearly erroneous standard of review." *United States v. Elder*, 90 F.3d 1110, 1133 (6th Cir. 1996).

The commentary to the Sentencing Guidelines explains that "[t]he adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S. Sentencing Guidelines Manual § 2D1.1, cmt. n.3 (1998); *United States v. Stewart*, __ F.3d __, Nos. 99-5615, 99-5850, 99-5852, 99-5853, 99-6248, 99-6249, 2002 WL 31010856, at *21 (6th Cir. Sept. 10, 2002) (reciting and applying this commentary). On December 23, 1998, a shotgun and loose ammunition were found in a closet next to the stairway that led to Harris's basement. Marijuana sales were conducted in the basement. At least as to the shotgun, Harris has failed to show that it was "clearly improbable that the weapon was connected with the offense."

**G.  The district court did not err in refusing to reduce Harris's base offense level for his role in the offense**

Harris also claims that the district court clearly erred when it refused his request for a minimal-role reduction in his base offense level. (Although he argues on appeal that he was entitled to either a minimal-role or minor-role reduction, Harris did not seek the latter at the district court level.) United States Sentencing Guidelines Manual § 3B1.2 instructs the sentencing court to decrease a defendant's base offense level by four points if he was a minimal participant in the criminal activity, or by two points if he was a minor participant. "We will reverse a district court's finding regarding a defendant's role in an offense only if we determine that the finding is clearly erroneous." *United States v. Burns*, 298 F.3d 523, 546 (6th Cir. 2002).

A minimal participant is one who is "plainly among the least culpable of those involved in the conduct of a group," and a minor participant is one who "is less culpable than most other participants, but whose role could not be described as

is a reasonable one." *Heights Cmty. Congress v. Hilltop Realty, Inc.*, 774 F.2d 135, 140 (6th Cir. 1985).

Under the United States Sentencing Guidelines, "[a] co-conspirator is not necessarily responsible for the total amount of [marijuana] involved in the conspiracy for purposes of establishing his base offense level. Rather, a participant is responsible for other conspirators' conduct only if that conduct was reasonably foreseeable to him and in furtherance of the execution of the jointly undertaken criminal activity." *United States v. Jenkins*, 4 F.3d 1338, 1346 (6th Cir. 1993); *see also* U.S. Sentencing Guidelines Manual § 1B1.3, cmt. n.2. The evidence at trial established that Harris accepted a package containing a tub with approximately 28 pounds of marijuana inside, and that four similar tubs were found in his residence. This alone suffices to support the district court's determination that he was responsible for 140 pounds of marijuana (5 tubs x 28 pounds/tub = 140 pounds). The testimony of Brown and Gardner, as well as that of law enforcement officers concerning drug tabulations found in Bartholomew's possession, support a finding that Bartholomew was responsible for at least an additional 80 pounds. We are thus unable to conclude that the district court clearly erred in determining the amounts of marijuana for which Bartholomew and Harris were responsible.

**F.   The district court did not err in enhancing Harris's base offense level for possession of a firearm in connection with the offense**

Harris next challenges the district court's decision to increase his base offense level by two points, pursuant to United States Sentencing Guidelines Manual § 2D1.1(b)(1), because it found that he possessed firearms in connection with the offenses of conviction. He contends that the firearms found upstairs in his residence belonged to his roommate, and that there was no proof that the shotgun in his closet had any connection to marijuana trafficking. "A district court's finding that a defendant possessed a firearm during a drug

*Yang*, 281 F.3d 534, 548 (6th Cir.), *petition for cert. filed*, 71 U.S.L.W. 3117 (U.S. July 25, 2002) (No. 02-136).

Analysis of a *Batson* claim is a three-step process. First, the defendants must make a prima facie showing that the prosecutor removed a potential juror for a discriminatory reason. If the defendants make this showing, the prosecutor has the burden to articulate a nondiscriminatory reason for the removal. Assuming that the prosecutor does so, the trial court must then determine whether the opponent of the peremptory strikes has proven purposeful discrimination. *Id.* at 548-49.

In this case, the prosecutor offered different reasons for each of the three peremptory challenges. He sought to strike Adams because she had shot her husband and had a son who had been convicted of a felony. Chatmon had gathered money to hire the attorney representing Jackson for her grandson. Hicks had a loud voice, was physically large, and impressed the prosecutor as a highly opinionated person.

The defendants characterize the prosecutor's explanations for excusing Adams and Chatmon as relying "in part" on the fact that "they had relatives in the criminal justice system." According to Bartholomew, Harris, and Henry, we need proceed no further. They contend that because a disproportionate number of black people are incarcerated, such an explanation is not race-neutral. The Supreme Court, however, has rejected this view. "[D]isparate impact should be given appropriate weight in determining whether the prosecutor acted with a forbidden intent, but it will not be conclusive in the preliminary race-neutrality step of the *Batson* inquiry. An argument relating to the impact of a classification does not alone show its purpose." *Hernandez v. New York*, 500 U.S. 352, 362 (1991).

We find the defendants' *Batson* challenges to the removal of Adams and Chatmon to be without merit. First, the prosecutor did not excuse these potential jurors simply because they had relatives in the criminal justice system. The

fact that Adams had shot her husband and that Chatmon had gathered money to hire Jackson's attorney are individualized considerations that could easily warrant the prosecutor's suspicion that they would not be impartial jurors. Furthermore, beyond highlighting the allegedly disparate impact, the defendants made no showing that the prosecutor's motives were discriminatory.

Indeed, we believe that the strike of Hicks presents the closer question. But we are mindful that the prosecutor's articulated reason need not be "persuasive, or even plausible," so long as it is nondiscriminatory. *Purkett v. Elem*, 514 U.S. 765, 767 (1995). "[T]he district court has the responsibility to assess the prosecutor's credibility under all of the pertinent circumstances." *United States v. Hill*, 146 F.3d 337, 342 (6th Cir. 1998). Among those circumstances is the "final makeup of the jury." *Yang*, 281 F.3d at 549. The removal of Adams, Chatmon, and Hicks still left a majority-female jury that included two African Americans. This being the case, we are unable to conclude that the district court's determination that the prosecutor's peremptory challenges were free of race and gender bias was clearly erroneous.

**C. The district court did not abuse its discretion in admitting evidence that (1) Jackson had purchased marijuana in 1997 from an undercover police officer in Pennsylvania, (2) Juliet Brown and Robin Caldwell had witnessed or participated in drug-related transactions by Bartholomew in 1996 and 1997, and (3) Henry had reserved a hotel room in Arizona in 1998 to conduct a drug transaction**

We will now consider the defendants' arguments that the district court erred in three of its evidentiary rulings. "[E]videntiary rulings are subject to the abuse of discretion standard of review." *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002). Under this standard, we will leave rulings about admissibility of evidence undisturbed unless we are "left with the definite and firm conviction that the

eyewitnesses gave conflicting testimony about his height. All of these eyewitnesses, however, were consistent in describing the clothing that Harris wore on December 23, and several of them positively identified him in court. A rational jury could therefore conclude that Harris was the person who received the UPS package.

Other evidence indicated that, after receiving the package, Harris engaged in countersurveillance before getting into a car with his codefendants. When he realized that the car was being followed, he tried to flee. In addition, Gardner testified that Jackson conducted multiple sales of marijuana in Harris's basement, and that Harris participated in these transactions. Given that "the connection between the defendant and the conspiracy need only be slight" and that a "conspiracy may be inferred from circumstantial evidence which may reasonably be interpreted as participation in a common plan," *United States v. Walls*, 293 F.3d 959, 967 (6th Cir.), *cert. denied*, No. 02-6359, 2002 WL 31187921 (U.S. Oct. 21, 2002), we conclude that Harris's conspiracy conviction is supported by ample evidence.

**E. The district court did not err in determining the amount of marijuana for which Bartholomew and Harris were responsible**

We will now proceed to examine challenges to the district court's sentencing determinations. Bartholomew and Harris contest the amounts of marijuana attributed to each of them. The district court found that Bartholomew was responsible for in excess of 220 pounds of marijuana and that Harris was responsible for 140 pounds of the drug. "We will reverse a sentencing court's drug-quantity determination only if we conclude that the determination is clearly erroneous." *United States v. Burns*, 298 F.3d 523, 545 (6th Cir.), *petition for cert. filed*, No. 02-7025 (U.S. Oct. 18, 2002). "[T]he test is whether there is evidence in the record to support the lower court's finding, and whether its construction of that evidence

unpersuasive. We therefore find no abuse of the district court's discretion in admitting the evidence concerning the Arizona drug transaction.

**D.  The district court did not err in denying Harris's motion for a judgment of acquittal**

At the close of trial, Harris moved for a judgment of acquittal on the conspiracy count, which the district court denied. He contends that the denial was in error. In reviewing a challenge to the sufficiency of the evidence, we determine whether, after viewing all of the evidence in the light most favorable to the government, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). This inquiry prohibits us from evaluating the strength of the evidence presented at trial or assessing the credibility of witnesses. *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994) (explaining that "[i]n cases in which we assess the sufficiency of the evidence, we do not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury").

"In order to show a conspiracy under § 846, the government must prove, beyond a reasonable doubt, (1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy." *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999) (internal quotation marks omitted). Harris argues in general terms that the evidence did not show his knowledge of, or agreement to join, the charged conspiracy.

As described in Part I.A. above, the jury heard a great deal of evidence detailing Harris's participation in the conspiracy. This included testimony that on December 23, 1998, Harris accepted, without surprise, a UPS package containing approximately 28 pounds of marijuana. He signed for it with a false name. Harris now argues that the evidence identifying him as the package's recipient was defective, because

[district] court . . . committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors or where it improperly applies the law or uses an erroneous legal standard." *Id.* (internal quotation marks omitted) (alteration in original).

Bartholomew, Harris, and Henry assert, though with little specificity, that the district court erred in admitting evidence of Jackson's purchase of marijuana in 1997 from an undercover police officer in Pennsylvania. They also claim, again without significant detail, that the district court should have excluded Brown's testimony that she witnessed large quantities of marijuana in the house that she shared with Bartholomew in 1996, and Caldwell's testimony that in 1997 and 1998 she transported large amounts of cash at Bartholomew's request to facilitate his drug transactions. This evidence was offered to prove the existence and extent of the conspiracy charged in the indictment.

The defendants concede that such proof may be evidence of *another* drug conspiracy or conspiracies, but they argue that events that happened in Indiana, Pennsylvania, and Texas had nothing to do with *this* conspiracy. They assert that the evidence was totally irrelevant and highly prejudicial. When defendants claim that the district court admitted evidence whose probative value was substantially outweighed by the danger of unfair prejudice, "we view the evidence in the light most favorable to the prosecution. As such, we maximize the probative value of the evidence and minimize its potential prejudice to the defendant[s]." *United States v. Logan*, 250 F.3d 350, 368 (6th Cir.) (internal citation omitted), *cert. denied*, 122 S. Ct. 216 (2001), *and cert. denied*, 122 S. Ct. 468 (2001).

The testimony of Brown, Caldwell, and Officer Watson described acts by persons who were alleged conspirators. These acts took place during the relevant time period and they concerned trafficking in marijuana. In addition, the geographical range of the events described by these witnesses

was consistent with other evidence about the operation of the charged conspiracy. The defendants' assertion of irrelevance is simply an unsupported argument. Because the probative value of the challenged evidence was high, and the potential for unfair prejudice to the defendants was low, we find no error in the district court's decision to admit the evidence.

Harris, in contrast to his codefendants, presents the alternative argument that even if the evidence "was admitted as part of the conspiracy," the conspiracy "was never sufficiently established in relation to Harris." Part II.D. below considers this argument to the extent that it is a contention that the evidence at trial was insufficient to support Harris's conviction. But the argument could also be construed as a claim that when one who is charged with conspiracy joins the criminal enterprise after its inception, only evidence of events that took place after he joined is admissible. Controlling case law, however, forecloses such a claim. *United States v. United States Gypsum Co.*, 333 U.S. 364, 393 (1948) ("With the conspiracy thus fully established, the declarations and acts of the various members, even though done or made prior to the adherence of some to the conspiracy, become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy."); *United States v. Cassity*, 631 F.2d 461, 464 (6th Cir. 1980) ("[W]e reject the argument by appellants that only those co-conspirator statements made after they joined the conspiracy are admissible against them.").

The final contested evidentiary issue concerns Henry's involvement in an Arizona drug transaction. This evidence was admitted pursuant to Federal Rule of Evidence 404(b), which provides that although evidence of other crimes or acts is not admissible to prove character, it may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Such evidence is admissible under Rule 404(b) if (1) "there is sufficient evidence that the other act in question actually occurred," (2) "the evidence of the other act is probative of a material issue other than character," and

(3) "the probative value of the evidence is [not] substantially outweighed by its potential prejudicial effect." *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002) (internal quotation marks omitted).

Both Bartholomew and Henry argue that the district court erred in admitting evidence about the Arizona transaction under Rule 404(b). Bartholomew asserts that the district court "did not weigh the prejudicial effect of the other acts evidence." His assertion is simply wrong. The district court specifically stated: "I also find . . . that the probative value of [the evidence involving Henry] as bad acts evidence to establish motive and an intent and plan and common scheme outweighs any prejudicial effect."

Henry, on the other hand, argues that the government failed to identify any material issue other than character that could be established by the challenged evidence. She further contends that no such issue existed, thus making the introduction of the evidence prejudicial as to her. These arguments are without merit. First, evidence of the Arizona transaction was admissible to prove that Henry was at the Flint, Michigan Budgetel Inn on December 23, 1998 as part of a drug-trafficking scheme, not for the purpose of furthering a social or intimate relationship with Jackson as she contended. The prosecutor properly identified the purpose of this evidence at trial.

Second, other than noting societal disfavor with dealing in narcotics, Henry has not explained how the Rule 404(b) evidence created a danger of unfair prejudice. Any such prejudice was minimized by the district court instructing the jury that it could consider evidence about the events in Arizona only "in deciding Ms. Henry's intent, preparation, plan, knowledge, or absence of mistake or accident as these concepts apply to the events in Flint, Michigan. The evidence is not to be considered for any other purpose and is only to be considered as to defendant Juleen Henry." Under these circumstances, we find Henry's claim of prejudice