**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0275n.06
Filed: April 12, 2005

**No. 04-5054**
**No. 04-5056**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| RODNEY ARNESS MOORE, | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF KENTUCKY |
| Defendant-Appellant, | ) | |
| | ) | |
| LAVAUGHIN DEWYNE JENKINS, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**Before: NELSON and SUTTON, Circuit Judges; WELLS, District Judge.**[*]

**WELLS, District Judge:** Defendant-Appellants Lavaughin Dewyne Jenkins ("Jenkins")

and Rodney Arness Moore ("Moore") challenge the district court's denial of their suppression

motions to exclude the fruits of a search on an apartment in which the police discovered illicit drugs,

jewelry from recent robberies, and two handguns. Appellant Jenkins, additionally, urges this court

to find the district court committed clear error in not mitigating his sentence under United States

Sentencing Guidelines ("U.S.S.G.") § 3B1.2 as a minor or minimal participant. Both appellants

challenge their sentences for violations pursuant to *United States v. Booker*, 125 S.Ct. 738 (2005).

---

[*]The Honorable Lesley Wells, United States District Judge for the Northern District of Ohio,
sitting by designation.

With regard to the suppression motions, the appellants level two principal charges: the initial officer on the scene, Charles Newman ("Newman"), did not possess the requisite level of suspicion to commit a stop which ultimately resulted in Moore's and Jenkins' arrest; and, Officer Newman did not have consent from Vauzaskia Yolanda Wardelle ("Wardelle") to search the nearby apartment which she shared with Moore and in which Jenkins stayed as a guest.

For the reasons set forth below, we find the district court did not clearly err in denying the defendant appellants' motions to suppress. Nor did the district court clearly err in refusing to mitigate Jenkins' sentence. With regard to the application of *Booker*, this court finds no violation in the sentencing of Moore, but vacates and remands Jenkins' sentence to the district court for resentencing in accordance with the reasoning of the court as discussed below.

## I. BACKGROUND

This case arises from a twelve-count indictment of three separate robberies, each involving carjacking, and firearms offenses. The government charged Moore on all twelve counts while Jenkins received an indictment on three counts for his participation in the third robbery. The first four counts provide the government's template of charges against Moore for robbery (of a Rentway Store on 9 November 2001), theft of a vehicle belonging to a store clerk, use of a firearm in relation to the robbery, and being a felon in possession of a firearm. The two subsequent robberies occurred on 30 November 2001 (Aaron's Rental Store), and 19 December 2001 (a different Rentway Store).

Moore and Jenkins both filed suppression motions which were denied and provide the basis for this appeal. The magistrate judge conducted a suppression hearing and filed a report

recommending denial of the motions. The district court adopted the magistrate judge's findings and denied appellants' suppression motions. Both defendants entered conditional guilty pleas, preserving their right to appeal the suppression determination. The district court sentenced Jenkins to a total of 121 months confinement subsequent to his guilty plea while Moore reached a plea agreement and received a 400 month sentence. Both defendants submitted timely appeals.

Officer Newman of the Jefferson County Police Department testified that while on patrol the night of 22 December 2001 he came upon an apartment complex and observed two black males walking toward a vehicle parked next to the apartment building in the fire lane. Officer Newman believed these two men were carrying open cans of beer. He asked them to "hang on," whereupon they set their beverages down and continued walking toward the parked vehicle and away from the officer. Newman approached the two men and requested they sit in their vehicle while he gathered information to ascertain whether they lived in the complex. Newman testified that while seated in the vehicle he observed Jenkins pitch a marijuana blunt beneath the car. Newman did not immediately respond to the action but called for backup while he worked to identify Moore and Jenkins. After backup arrived, Newman retrieved the blunt from beneath the vehicle, patted Jenkins down, and placed him in the squad car. Both Moore and Jenkins were placed under arrest at that time for public drinking and possession of marijuana.

After reading them their Miranda rights, Officer Newman asked the appellants which apartment they had left when he first saw them walking toward their vehicle. He was directed to apartment number 501, where Ms. Wardelle answered the door. Officer Newman testified to

smelling the odor of marijuana coming from inside the apartment. Wardelle identified Moore and

Jenkins, confirmed they had come from the apartment, and were staying with her temporarily.

Once Officer Newman completed identifying the appellants he returned to apartment 501

to take more information from Ms. Wardelle. According to Newman, he asked if he could stand

inside, because it was cold, and Wardelle invited the officer into her apartment. Newman told

Wardelle about the drug trafficking in the area, the smell of marijuana he noticed in the apartment,

and the marijuana residue in plain view on the living room coffee table where the two were standing.

Officer Newman asked Ms. Wardelle's permission to search the apartment, to which she consented

verbally, adding that any illegal substances found in the apartment belonged to Moore and Jenkins.

According to Officer Newman, Ms. Wardelle led him to a cookie jar on top of the refrigerator which

contained marijuana.

After being shown the marijuana, and before proceeding any further Officer Brad

Woolridge, one of the officers called by Newman for back-up, produced a consent form which

Newman filled out, read to Ms. Wardelle, and asked her to sign. According to Newman, the written

consent form was received within a few minutes after Wardelle's oral consent to search. Given that

testimony, the magistrate judge concluded in his report that the time on the document was

mislabeled as 0110 AM (corresponding to 1:10 AM) rather than 0010 AM (corresponding to 12:10

AM).

According to the officers' testimony, Ms. Wardelle fully cooperated by taking them through

the apartment, but asked they not disturb her son sleeping in the back bedroom. The officers found

unlabeled prescriptions pills in Wardelle's bedroom which she admitted were purchased "off the street," jewelry in Crown Royal bags with the price tags still affixed, and tagged jewelry on the bedroom dresser. About ten minutes into the search Officer Newman called for the assistance of a K-9 unit. When Detective Richard Gibbs arrived with his drug dog he asked Ms. Wardelle's permission to enter the apartment. Ms. Wardelle orally consented to the search after the officers convinced her that the dog would not present a physical danger to her. The dog alerted to the presence of drugs on the coffee table, at the garbage can in the kitchen, and on the Crown Royal bag in Ms. Wardelle's bedroom.

After finding some jewelry with price tags still affixed, Officers Newman and Woolridge conferred with Woolridge's partner, Sgt. Minogue, who had taken part in an investigation of a series of armed robberies from which jewelry had been stolen. Officer Minogue then phoned Detectives Duane Colebank, the lead detective assigned to the robberies, and his partner Brian Arnold regarding possible stolen merchandise. Colebank testified that he received a telephone call from Officer Minogue at approximately 12:20 AM. The detectives arrived on the scene at 12:31 AM and Newman and Minogue briefed Colebank, provided him with Ms. Wardelle's written consent for the case file, and introduced Colebank to Wardelle. By this time Wardelle's son had awoken and was seated on the couch with his mother. Det. Colebank asked Wardelle if she and her son were the sole occupants of the apartment, which she affirmed noting that Moore and Jenkins were temporary guests. Colebank then asked Wardelle if he could search the apartment. She agreed and according

to the Officers' testimony was fully cooperative.[1]  Det. Colebank then had her read and sign a second consent form used by the Robbery Unit of the Department.

Officer Newman then led Colebank through the apartment pointing out where he had found jewelry during the initial consent search.  Colebank discovered two handguns along with jewelry in the bedroom closet.  The guns were subsequently identified as those used by the appellants during the robberies.  Colebank searched Moore and found six pieces of stolen jewelry on his person.  Moore also led Colebank to other stashes of jewelry hidden in the apartment.  Detective Arnold testified that during Colebank's search of the apartment he sat with Wardelle and her son Jerome Earsery ("Jerome") and talked about video games and school.

Fifteen-year-old Jerome testified, according to the magistrate judge's report, "to a significantly different version of events that evening."  Jerome testified that he answered the door when Officer Newman first knocked at the apartment, that he asked Newman to wait, closed the door and went to the bedroom to fetch his mother.  When he returned to the living room Officer Newman was standing in the doorway of the apartment uninvited. Jerome went to the back bedroom when his mother entered the living room, where he remained for approximately ten minutes until another officer asked him to come sit in the living room.  Jerome testified that the officers were "OK," and did not draw their weapons. Jerome testified that Det. Colebank gave his mother a piece

---

[1]At the time of her consent, Ms. Wardelle was not yet under arrest, though she was later charged with several drug-related misdemeanor offenses.  According to the record, these offenses were subsequently dismissed pursuant to Wardelle's testimony in prosecuting this case.

of paper to sign after the search and then handed her a second piece of paper.  According to Jerome, just prior to leaving the apartment and after handing Wardelle the two pieces of paper, Det. Colebank threatened her with prosecution if she made the officers "look like fools" in court.  Jerome also testified that Mr. Moore had lived with him and his mother since they had moved into the apartment.

Ms. Wardelle testified that Officer Newman had come into the apartment without consent and asked her if she knew the two appellants.  In her testimony during the suppression hearing, Wardelle denied inviting Officer Newman into the apartment, could not recall signing the first written consent form, did not remember Newman and Woolridge going through the apartment in search of the stolen jewelry, denied seeing any of the jewelry or the marijuana, and denied ever receiving any form from Newman to sign.  She also testified that Det. Colebank had her sign the second consent form at the end of the jewelry search, and after she signed he threatened her with prosecution if she made them look like fools in court.

## II.  LAW & ANALYSIS

### A.  STANDARD OF REVIEW

This court reviews the district court's findings of facts in a motion to suppress for clear error, while it reviews the district court's conclusions of law *de novo*.  *United States v. Hurst,* 228 F.3d 751, 756 (6ᵗʰ Cir. 2000).  When reviewing a denial of a motion to suppress, the appellate court considers evidence in the light most favorable to the United States.  *United States v. Erwin*, 155 F. 3d 818, 822 (6ᵗʰ Cir. 1998).  Additionally, in cases in which the suppression hearing testimony

advances two plausible scenarios, the trial judge's decision cannot be clearly erroneous. *United States v. Taylor*, 956 F.2d 572, 576 (6th Cir.1992). *See also United States v. Rose*, 889 F.2d 1490, 1494 (6th Cir. 1989) (noting "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous") (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574) (1985) (clearly erroneous standard "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently"); *accord Hernandez v. New York*, 500 U.S. 352 (1991).

### B. OFFICER NEWMAN'S INVESTIGATIVE STOP OF MOORE AND JENKINS.

Appellants urge this court to conclude that on the evening in question, Officer Newman did not possess a reasonable basis to either stop or arrest them. They contend that in the circumstances of the dimly lit parking lot, Newman could not have discerned they were drinking beer, nor could he have known that the cigar which Jenkins rolled underneath the car was a marijuana blunt. The appellants' arguments do not pass muster.

*Terry v. Ohio*, 392 U.S. 1, 21 (1968), establishes the standard for an investigative stop such as the one in this case. A stop may legitimately occur where the officer can point to a specific and articulable fact, or set of facts, that gave rise to his or her reasonable suspicion of criminal activity. When an officer conducts a brief investigatory stop of a person or vehicle, "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *cf. Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000) (noting that an officer conducting an investigatory stop "must be able

to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity")

(quotations omitted). In reviewing a reasonable suspicion determination, we consider the "totality

of the circumstances" to determine whether the detaining officers had a "particularized and objective

basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449

U.S. 411, 417-18 (1981); *United States v. Orsolini*, 300 F.3d 724, 728 (6th Cir.2002).

The district court did not commit clear error when it adopted the magistrate judge's report

finding Officer Newman had reasonable suspicion of criminal activity by defendants Moore and

Jenkins. Both men were drinking alcohol in a public place, a violation of Ky. Rev. Stat. § 222.202.

When Newman asked the appellants to wait, they set their beer cans down and continued to walk

away from the officer and toward their vehicle parked illegally in a fire lane. Further, while

Newman was talking with appellants, Jenkins attempted to dispose of a marijuana blunt while he

also provided the officer with a false name. The appellants' conduct combined to create an

objectively reasonable basis upon which Officer Newman might conclude the two were involved

in criminal activity. The record also indicates some concern with trespassers on the property of the

apartment complex which appears to have been Newman's original impetus for investigating the

presence of Moore and Jenkins.

What was an investigative stop became -- with the public drinking, Jenkins' reluctance to

provide his name, and the marijuana possession -- grounds for Newman to form probable cause to

arrest the appellants. The subsequent pat-down search was permissible as incident to a

lawful arrest. Under the "search-incident-to-a-lawful-arrest" exception to the warrant requirement,

a law enforcement officer may conduct a full search of an arrestee's person incident to a lawful custodial arrest. *United States v. Robinson*, 414 U.S. 218, 234-35 (1973) (explaining that the reasoning behind this exception is the "need to disarm the suspect in order to take him into custody [and] ... the need to preserve evidence on his person for later use at trial"); *see U.S. v. Montgomery*, 377 F.3d 582 (6th Cir. 2004) (finding troopers had probable cause to arrest and pat-down suspect after viewing marijuana in his car).

### C. THE SEARCH OF APARTMENT #501.

A search may be conducted without a warrant if a person with a privacy interest in the item to be searched gives free and voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 222 (1973); *accord United States v. Kelly*, 913 F.2d 261, 265 (6th Cir.1990). A court will determine whether consent is free and voluntary by examining the totality of the circumstances. *Schneckloth*, 412 U.S. at 226. It is the Government's burden, by a preponderance of the evidence, to show through "clear and positive testimony" that valid consent was obtained. *United States v. Scott*, 578 F.2d 1186, 1188 (6th Cir.), *cert. denied*, 439 U.S. 870 (1978). Several factors should be examined to determine whether consent is valid, including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police. *United States v. Jones*, 846 F.2d 358, 360 (6th Cir.1988) (citing *Schneckloth*, 412 U.S. at 226, 248); *U.S. v. Burns*, 298 F.3d 523 (6th Cir. 2002)

(consent was freely given and not invalidated even where appellant was handcuffed and in custody at the time).

Both Moore and Jenkins have a reasonable expectation of privacy in the searched apartment providing standing for their challenge of the warrantless search. As a leaseholder Moore certainly has standing. The evidence combines to suggest that Jenkins was a guest with limited ingress and egress. He did not have a key, his belongings were kept in a garbage bag in the closet, he slept on the living room couch, and he did not pay rent or utilities. However, he had spent the three weeks prior to the night of his arrest sleeping in the apartment. Pursuant to the holding in *Minnesota v. Olsen*, 495 U.S. 91, 98 (1990), an overnight guest has a legitimate expectation of privacy under certain circumstances. Jenkins' long stay prior to his arrest provides that expectation of privacy.

Ms. Wardelle had "common authority or control" over the room that allowed her to consent to a search. The Supreme Court has defined "common authority or control" as

> [the] mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their members might permit the common area to be searched.

*United States v. Matlock*, 415 U.S. 164, 171 n. 7 (1974). The concept of "common authority or control" enables a co-occupant such as Wardelle to consent to a search if that party has the right to use or possess the property. As the magistrate judge properly observed from the record, Wardelle had both actual and apparent authority to consent. She had signed the lease agreement, had a key

to the apartment, was unconstrained in her movement within and to and from the apartment, and the rental contained her personal property.

The district court adopted the magistrate judge's considered recommendation which weighed the evidence of Wardelle's oral and written consent and the officers' testimony against the testimony of Wardelle and her son. Finding Wardelle's testimony "not credible," the court concluded that the evidence and countervailing testimony represented a credible version of events signifying Wardelle's consent to allow the officers to search the apartment. The evidence of Wardelle's signatures meshed with the officers' testimony that Newman provided Det. Colebank with the signed consent form when the detective arrived to search for the jewelry at 12:31 AM. Wardelle's blanket denials of the first consent form served to undermine her credibility given the form, admittedly, carried her signature. While it is possible that Wardelle signed the second consent form after the search, as she testifies, by then she had already provided written and oral consent for the search to Officer Newman and Detective Gibbs. The officers' testimony is neither internally inconsistent nor implausible on this question and, thus, the issue tilts in favor of the government's argument that the district court did not commit clear error in denying the appellants' motions to suppress by finding that Wardelle consented to the search.

The remaining issue is whether the consent was given voluntarily, or whether it was the result of coercion. A trial court is given wide latitude to assess the credibility of witnesses as "[w]hether consent to a search is voluntarily given is a question of fact." *United States v. Erwin*,

155 F.3d 818, (6th Cir.1998).   Nonetheless, the court's discretion is not unlimited.  A trial court's decision to credit a witness' testimony may be held erroneous on review if "[d]ocuments or objective evidence ... contradict the witness' story; or the story itself [is] so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it."  *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-75 (1985).

The testimony of the officers regarding Wardelle's oral consent for the initial entry of Officer Newman into the apartment,  and her further willingness to sign the two written consent forms does not appear implausible nor betray internal inconsistencies.[2]  Appellants' argument that Wardelle was merely acquiescing to the search for fear that her parole would be ended is certainly plausible.  It is also plausible that once Officer Newman was at Wardelle's door smelling the odor of marijuana, Wardelle consented to a search to protect herself.  However, because the officers' evidence and testimony were reasonable, without internal inconsistencies or implausibilities, the district court cannot be found to have committed clear error in believing the officers' version of the evening.

---

[2]The scope and timing of the first written consent form raised some question of internal consistency.  The consent form Officer Newman provided to Ms. Wardelle to sign defined the scope of the search as one for evidence of "narcotics, robbery or theft," and Newman testified he initially considered the search as one merely for narcotics.  Moreover, Officer Newman wrote the time of the first consent as "0110," or 1:10 AM – which was considerably later than the search actually occurred according to the corroborating testimony and evidence – suggesting that the first consent form was presented after the search occurred.  These seeming inconsistencies melt away in the face of evidence that Officer Newman simply mislabeled the time of the consent form, which he did consistently on two other documents (uniform citation reports).  With regard to the scope of the consent form, according to Officer Newman's further testimony, Police Department procedure encouraged defining the scope of consent widely prior to a search to ward against subsequent claims of exceeding the scope of the consent. Accordingly, the consent form's multiple listing did not necessarily indicate a *post priori* consent, manufactured after the jewelry was found.

### D.  **MITIGATING JENKINS' SENTENCE UNDER USSG § 3B1.2.**

Separately, defendant Jenkins has urged this court to regard his participation in the third robbery as minimal or minor triggering a reduction of his sentencing offense level, pursuant to U.S.S.G. § 3B1.2.  Jenkins points out that he did not carry a firearm during the robbery and that Moore planned the heist while Jenkins simply assisted.

Pursuant to § 3B1.2, a defendant may receive a four-level reduction in his or her base offense level for being a minimal participant or a two-level reduction for being a minor participant.  "A minimal participant is one who is 'plainly among the least culpable of those involved in the conduct of a group, 'and a minor participant is one who 'is less culpable than most other participants, but whose role could not be described as minimal.'" *United States v. Bartholomew*, 310 F.3d 912, 924 (6th Cir.2002) (quoting U.S.S.G. § 3B1.2, cmt. nn. 1, 3).  "Whether a defendant is entitled to a downward [adjustment] under § 3B1.2 depends heavily on factual determinations, which we review only for clear error." *United States v. Campbell*, 279 F.3d 392, 396 (6th Cir.2002).  Jenkins has the burden of proving, by a preponderance of the evidence, that he is entitled to the reduction.  *United States v. Bartholomew*, 310 F.3d at 924.

In sentencing Jenkins, the district court took into consideration the fact that Moore was the leader and carried the firearm.  However, the court reasoned, appropriately, from the evidence that acknowledging Moore as the armed leader of the robbery only made Moore's role "more significant," rather than reducing Jenkins' participation to a minor or minimal role.  The court also took into account Jenkins' statement to police that the robbery sounded like a "good idea."

Additionally, a Rentway clerk working the store at the time of the third robbery stated that Jenkins took an active role in the incident, directing questions to him about the safe, whether it was open and what it contained. The clerk related that when Moore smashed the display case housing some jewelry, Jenkins proceeded to fill the backpack he had carried into the store. Jenkins also had some of the jewelry on his person the evening of his arrest. The clerk's testimony suggests that Moore and Jenkins worked very much in tandem and seriously compromises any representation of Jenkins as a marginal figure in the incident.

We find no clear error in the district court's refusal to apply U.S.S.G. § 3B1.2 to Jenkins' sentence and, accordingly, affirm that determination.

**E. APPLICATION OF *United States v. Booker***

In letter briefs prior to oral argument, both Moore and Jenkins urged this court to vacate their sentences and remand their cases to the district court for resentencing in light of the Supreme Court's recent decision in *United States v. Booker*, 125 S.Ct. 738 (2005). Moore contends that *Booker* requires the court to resentence him due to computed loss valuations for vehicles and jewelry not found by a jury nor alleged in the indictment. Additionally, Moore suggests his designation as a career offender in his PSR violated his Sixth Amendment rights under *Booker*. Jenkins maintains that under *Booker* his Sixth Amendment rights were violated during sentencing in two instances: an enhanced adjustment for "amount of loss," and the court's refusal to apply a mitigating adjustment for a lesser role.

In *Booker*, the Supreme Court concluded the Sixth Amendment prevents federal judges from making factual determinations that increase a defendant's sentence beyond that which is authorized on the basis of facts "established by a plea of guilty or a jury verdict." *Booker*, 125 S.Ct. at 756. The Court determined that enhancing sentences based on facts found by the court alone and not by the jury violated the Sixth Amendment imperative that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id.* (*citing Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)). An "enhanced sentence" is a guideline sentence "exceeding the maximum authorized by the facts established by the plea of guilty or a jury verdict." *Id.* at 756.

The holding in *Booker* applies "not only to those defendants like Booker, whose sentences had been imposed in violation of the Sixth Amendment, but also to those defendants, like Fanfan, who had been sentenced under the mandatory regime without suffering a constitutional violation." *United States v. Hughes*, 396 F.3d 374, 379 (4th Cir. 2005). The Sixth Amendment does not apply to agreed-upon facts; it regulates the decisionmaker of disputed facts. *See Blakely v. Washington*, — U.S. — , —, 124 S.Ct. 2531, 2537 (2004) (holding "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant"). Because Moore's sentence was based solely upon facts admitted by him in his guilty plea, his case is more analogous to Fanfan's than to Booker's.

We find no error in Moore's sentencing. Moore reached a plea agreement pursuant to Fed. R. Crim. P. 11(c)(1)(A)[3], in which the government consented to drop two of the three 18 U.S.C. § 924(c) firearms charges and implement a range plea. Prior to the plea Moore was facing a mandatory minimum sentence of 57 years for the multiple 18 U.S.C. § 924(c) counts. Under the terms of his plea agreement, Moore admitted to the facts forming the basis of the ten remaining counts in the indictment while the government could not ask the district court for more than a 35 year sentence and Moore's counsel could argue for no less than 25 years. Thus, when Moore and the government jointly stipulated to the plea range and the factual predicates underlying the plea, the district court was bound by this stipulation once it accepted the plea agreement. After due consideration for the reasoning behind the application of a range plea in this instance – Moore's age at commitment, his advanced age and lack of threat to society at time of his release – the court sentenced Moore to 400 months. The district court did not, then, engage in fact finding, it merely applied the terms of the plea agreement, to which it was bound. Moreover, there is no possible claim of prejudice given that Moore stipulated to a range plea of no more than 35 years and the court only sentenced him to 33 years.

---

[3]Under Fed.R.Crim.P. 11(c)(1):
If the defendant pleads guilty or nolo contendere to a charged offense or a lesser or related offense, the plea agreement may specify that an attorney for the government will ... (C) agree that a specific sentence or sentencing range is the appropriate disposition of the case, or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request binds the court once the court accepts the plea agreement).

With regard to Jenkins' sentence, however, we conclude that *Booker* requires we vacate his sentence and remand the case to the district court for resentencing. Jenkins challenged the proposed application of a one-level sentence enhancement for valuation, pursuant to U.S.S.G. § 2B3.1(b)(7)(B), for loss in excess of $10,000. We find that Jenkins' challenge survives plain error review.

Pursuant to *Booker*, not every appeal will lead to a new sentencing hearing because reviewing courts should apply "ordinary prudential doctrines, determining for example, whether the issue was raised below and whether it fails the 'plain error' test." *Booker* at 769. To reach the merits of a forfeited claim requires us to find (1) error, (2) that is plain, and (3) that affects the defendant's substantial rights, before we may exercise our discretion to notice if the forfeited error (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732 (1993); *United States. v. Oliver*, 397 F.3d 369, 375-76 (6th Cir. 2005).

In enhancing Jenkins' sentence for an "amount of loss" over the defendant's objections the district court relied on judge-found facts that were not established by a jury beyond a reasonable doubt. Jenkins pled guilty to one count of aiding and abetting in a robbery, one count of aiding and abetting in the theft of a motor vehicle, and one count of brandishing a firearm in furtherance of a crime of violence, resulting in a base offense level of twenty. The district court then imposed a one level enhancement pursuant to U.S.S.G § 2B3.1(b)(7)(B) for loss exceeding $10,000 but not more than $50,000. The district court found Jenkins' sentencing range rested between 37 and 46 months

under the guideline provisions, with a minimum seven year (84 months) term, to be served consecutively for the firearms count, under 18 USC § 924 (c)(1)(A)(ii). The district court then imposed a sentence of 121 months, comprising a combination of 37 months for the underlying offense and 84 months for the weapons count. Had Jenkins' offense level been calculated based solely on facts proved beyond a reasonable doubt and not on the additional facts found by the district court, the applicable Guidelines range would have been 33 to 41 months, resulting in a sentence of between 117 and 125 months. Thus, pursuant to *Booker*, the court erred in its enhancement of Jenkins' sentence. *U.S. v. Davis* 397 F.3d 340, 350 (6th Cir. 2005); *U.S. v. McDaniel*, 398 F.3d 540, 548-49 (6th Cir. 2005).

We conclude, next, that the error committed by the district court in sentencing Jenkins was clear, in that the constitutional infirmity of the Guidelines was obvious "at the time of appellate consideration." *Johnson v. U.S.*, 520 U.S. 461, 468 (1997); *U.S. v. Oliver*, 97 F.3d 369, 378 (6th Cir. 2005).

Based upon the district court's imposition of a sentence at the lowest end of the Guideline range for Jenkins' offense we believe that the court might well have sentenced him to fewer than 121 months in prison had the court been so allowed. Of course, the district court might also have elected not to depart from the recommendation of the Guidelines, but it never had the opportunity to make that decision. We therefore conclude that the error affected Jenkins' substantial rights. *See United States v. Barnett*, 398 F.3d 516, 528 (holding that prejudice to the defendant was presumed where, unbound by the prescribed Guidelines range, the district court may have imposed a lower sentence);

*United States v. Davis*, 397 F.3d 340, 349 (6th Cir.2005) (finding the defendant's substantial rights affected where the district court's comments at sentencing raised the likelihood of a lower sentence for the defendant had the court possessed post-*Booker* discretion).  In *United States v. Oliver*, the Court concluded that a case should be remanded if it is "arguable" that the defendant received a longer sentence than would be the case if the sentencing court exercised the broader discretion that *Booker* requires.  *United States v. Oliver,* 97 F.3d  at 381 n. 3.

Finally, having concluded the district court's plain error affected Jenkins' substantial rights we must also determine whether the error has seriously affected the "fairness, integrity, or public reputation of judicial proceedings," before exercising our discretion to review Jenkins' *Booker* claim.  We agree with the court in *Hamm* that "an exercise of our discretion is appropriate here, given that '[w]e would be usurping the discretionary power granted to the district courts by *Booker* if we were to assume that the district court would have given [the defendant] the same sentence post-*Booker*.'" *U.S. v. Hamm*, --- F.3d ----, 2005 WL 525232 at *4 (6th Cir. March 8 2005), quoting *Oliver*, 397 F.3d at 381 n. 3.

Therefore, because we find, predicated on the hindsight provided by *Booker*, that the district court committed plain error in imposing Jenkins' sentence, we vacate and remand his case for resentencing.

### III. CONCLUSION

For all of the reasons set forth above, we AFFIRM the district court's denial of defendants' suppression motions, AFFIRM Moore's sentence but VACATE Jenkins' sentence and REMAND the latter case to the district court for resentencing.